No. 115,426

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

S<small>TATE OF</small> K<small>ANSAS</small>,
*Appellee*,

v.

M<small>ARCUS</small> T<small>HIASEN</small> G<small>UEIN</small>, J<small>R</small>.,
*Appellant.*

SYLLABUS BY THE COURT

1.

When an appellate court reviews the district court's decision on a motion to suppress evidence in a criminal case, we first determine whether the district court's factual findings are supported by substantial evidence. We then review the district court's ultimate legal conclusions independently, without any required deference to its conclusion. When the significant facts are not in dispute, whether to grant or deny a suppression motion presents a question of law over which we have unlimited review.

2.

*Miranda* warnings are required for a custodial interrogation. So two elements must be present for *Miranda* warnings to be required: custody and interrogation.

3.

A person is in custody for *Miranda* purposes when formally taken into custody or deprived of his or her freedom in a significant way. A court must consider the circumstances of the interrogation and whether a reasonable person would have felt that he or she could terminate the investigation and leave.

4.

In some cases, such as routine traffic stops in which the detention is brief and the encounter occurs in public, no *Miranda* warnings are required even though the person is not free to leave. When a person is subject to restaints comparable to those associated with formal arrest, however, the person is in custody for *Miranda* purposes.

5.

On the facts of this case, in which the initial questioning of the defendant occurred during a pat-down for officer safety just after the defendant had been asked to get out of his car in a public parking lot, no weapons were drawn, and the encounter had only lasted about 1 minute, the defendant was not yet in custody for *Miranda* purposes.

6.

The Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights protect the right of all of us to be free from unreasonable searches and seizures by the government. Under caselaw applying these provisions, a search without a warrant is unreasonable unless it falls within one of several limited, well-defined exceptions to the warrant requirement.

7.

One recognized exception to the warrant requirement applies when the officer has probable cause to search and exigent circumstances are present. Probable cause means that a reasonable person would conclude that there is a fair probability that the place to be searched contains contraband or evidence of a crime. Exigent circumstances exist when the law-enforcement officer has a reasonable belief that there is a threat of imminent loss, destruction, removal, or concealment of evidence or contraband.

8.

On the facts of this case, in which an officer had smelled marijuana about the defendant's person and the defendant had admitted that he had marijuana stashed in his underwear, the officer had probable cause to search for and seize the marijuana. In addition, since a small quantity of marijuana might easily be hidden, destroyed, or ingested, exigent circumstances were also present.

9.

When a defendant claims that a statement made to police wasn't voluntary, the State has the burden to show that the statement was the product of the defendant's free and independent will.

10.

In determining whether a statement is voluntary, courts look at all the circumstances, including this nonexclusive list of factors: (1) the mental condition of the accused; (2) the manner and duration of the interrogation; (3) the accused's ability to communicate on request with others; (4) the accused's age, intellect, and background; (5) the fairness of officers in conducting the interrogation; and (6) how fluent the accused was with the language used for the interrogation.

11.

On the facts of this case, in which the officer used strong language that implied a threat of physical harm if the defendant did not answer questions, minimized the importance of the *Miranda* warnings, handcuffed the defendant before making the implied physical threat, left the defendant to think over what he had been told for about 10 minutes before proceeding with questioning, and conducted the questioning while the

defendant remained handcuffed, we conclude that the State failed to prove that the statements made by the defendant were voluntary.

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed January 20, 2017. Reversed and remanded with directions.

*Mitch Biebighauser*, of Bath & Edmonds, P.A., of Overland Park, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., LEBEN and GARDNER, JJ.

LEBEN, J.:  Marcus Guein, Jr., appeals his conviction for two drug-related offenses, claiming that statements he made to a police officer should not have been allowed at his trial because they weren't made voluntarily. Guein made the statements while he was handcuffed and in police custody—and after he'd been read his *Miranda* rights.

After carefully reviewing Guein's interaction with the police officer who questioned him, we agree with Guein that the officer's forceful admonitions to cooperate when the officer questioned him—admonitions that contained an implied threat of physical harm if Guein did not cooperate—rendered his statements to the officer involuntary and inadmissible. We therefore reverse his convictions and remand the case to the district court for further proceedings.

We want the reader to know that we do recognize that some of the language in our opinion is vulgar enough that it cannot be used on over-the-air television shows. Yet we have used it in a published judicial opinion. We do so because this language carries a certain force that's not necessarily apparent if we rephrase it. We must judge the effect of

4

the words said—in this case by a police officer—on the person in handcuffs who heard them. To make that judgment and to explain our decision, we must repeat the actual words used and place them in the context in which they were said.

With that introduction, we turn now to the factual and procedural setting in which these issues are presented. We will then address each of the three legal issues Guein raises on appeal, only one of which is successful.

FACTUAL AND PROCEDURAL BACKGROUND

Around 1:30 a.m. on August 16, 2014, two Lenexa police officers, Curtis Weber and Megan Larson, were heading back to the police station when they noticed two cars in the parking lot of a Burger King that they believed was closed. Weber considered the area a high-crime area. The officers saw the driver of a brown Chevy Caprice, later identified as Guein, get out and enter the passenger side of the other vehicle, a blue Saturn Ion. Believing that a drug deal was taking place, Weber pulled into the parking lot, switched off the headlights on the patrol car, and parked several spaces away from the other cars.

Weber approached the open window on the driver's side of the Ion and immediately smelled the odor of marijuana coming from the car. He asked the driver, Jordan Gresham, to step out of the car and for permission to search him. Gresham agreed; nothing was found on him.

As Weber finished with Gresham, Larson asked Guein to step out of the vehicle. Weber then approached Guein and asked him if he had any weapons on him, which Guein denied. The officer asked Guein if he would consent to a pat-down to check for weapons, and Guein did. Weber had Guein place his hands on his head during the pat-down, facing away from the officer. The officer then asked Guein if he could reach inside his pockets; Guein again consented. Weber removed several items from Guein's pockets

5

and placed them to the side. Weber agreed at the suppression hearing that Guein was not free to leave at that point.

Weber said that while he was doing the pat-down, he noticed a strong odor of fresh marijuana coming from Guein. He said to Guein, "Dude, you reek of weed," and asked Guein how much marijuana he had on him. Guein replied, "I have none." Weber responded, "You have none?" Guein replied that he had "a little bag" on him. Weber asked him where it was, and Guein indicated that it was in his underwear. Weber asked Guein to retrieve the bag of marijuana, and he complied. After Guein had handed over the marijuana, Weber handcuffed him, with Guein's hands behind him, and began to walk with Guein to the police car.

We are able to report the next part of the conversation between Guein and Weber in detail because it's recorded on a video of their encounter and is part of our record. In between handcuffing Guein and putting Guein into the police car, Weber told Guein several things, including that he was going to be asking him some questions in a while and that Guein should "be honest with" and not "fuck with" him:

> Weber: "Right now is the time to be honest with me, man, okay? Don't fuck around with me and I ain't gonna fuck around with you, okay? You hear me?"
> Guein: "I'm not going to fuck around with you."
> Weber: "Listen, man. I'm telling you right now I know what you're doing out here. I'm going to ask you some questions here in a little bit."
> Guein: "Yes, sir."
> Weber: "Don't fuck with me, okay?"
> Guein: "I understand, sir."
> Weber: "You hear me? You don't screw around with me, I ain't gonna screw around with you. I'm gonna do what I can to help you out, okay?"
> Guein: "Yes, sir."
> Weber: "I'm telling you right now, I know what's going on, all right? Have a seat."

At that point, Weber placed the handcuffed Guein in the back seat of a patrol car.

We should report a few more things that Weber discussed with Guein in between handcuffing him and giving him the *Miranda* warnings. We don't have a recording of this part of the conversation because the district court granted the defendant's motion to keep these statements out of the jury trial. Accordingly, they were deleted from the video that was played to the jury—and that video is apparently the one that has been included in the record provided to us. (Based on the transcript of the suppression hearing, a slightly different version of the video, apparently with fewer deletions, was admitted in evidence at that hearing. The parties made no comment in their appellate briefs about why only the video from the trial is included in our record.)

Weber testified that he had asked Guein whether there was any other marijuana in either of the cars. Guein eventually admitted that there was some in the brown Chevy Caprice. Weber looked through the windows of the car and saw a handgun on the driver's side floorboard just underneath the driver's seat and some loose bits of unsmoked marijuana (known as marijuana shake) throughout the car. As a result of this observation, Weber requested that a police unit with a drug-detection dog come to the scene. He also removed the gun from the car and secured it. Guein legally owned the gun, which he said he needed for protection in his neighborhood in Kansas City, Missouri.

Our record doesn't tell us whether Lenexa officers are trained to provide a warning of the sort given to Guein to suspects on a general basis, but we do know that Officer Weber gave essentially the same warning to both suspects in this case. After Weber had placed Guein in the police car to await their later discussion, he told the other suspect that he would ask him questions a bit later and warned him not to "fuck around with me":

7

"I'm going to tell you just like I told your buddy: We know what's going on here, okay? We're not going to ask you questions right now, we're going to ask you questions here in a minute, all right? I'm gonna tell you, don't fuck around with me, okay? You don't screw with me, I ain't gonna screw with you, you understand? All right? And I'll tell you, I know what's happening right now. All right? Have a seat."

And as with Guein, the other suspect was then put in the back seat of a patrol car and left to await further interrogation.

After Weber had that conversation with the other suspect, Weber returned to Guein, who had been sitting, handcuffed in the patrol car for about 10 minutes. Weber then said he was required to read Guein his rights because Guein was in handcuffs; we again have a recording of this conversation. Weber read the *Miranda* warnings and then asked whether Guein wanted to talk to him:

Weber: "All right, man, I'm going to read you your rights. You ever been arrested?"
Guein: "No."
Weber: "Never? You never been put in handcuffs?"
Guein: "No."
Weber: "Okay. I'm gonna read you your rights. You've seen or heard it on TV; I've gotta do it because you're in handcuffs, okay? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him present while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights, not answer any questions, or make any statements. Do you understand each of those rights that I've explained to you—there were five of them?"
Guein: "Yes, sir."
Weber: "And with those rights in mind, do you want to talk to me?"
Guein: "Yeah, man."

Weber then asked Guein why he was in the Burger King parking lot at 1:30 in the morning. Guein explained that he had initially gone to the Burger King for an Icee and had then met Gresham "to help him out with something." Weber asked him to explain, and Guein responded, "He had asked me, did I know where he could find something like that, and I was like, maybe so." Weber asked Guein, "Find something like what?" Guein replied, "Like what you found on me." Weber asked whether Guein meant the marijuana, and Guein responded, "Yes, sir." Upon further questioning, Guein acknowledged that he had purchased the marijuana for $25 and intended to sell it to Gresham for $50.

Guein told Weber that he was nervous and asked whether he could call his "lady friend" as she was expecting him to return. Weber responded that they would get everything "squared away" but that it would take a few minutes and instructed Guein to "sit tight."

A short time later, Weber returned to the car and spoke to Guein about whether he would be willing to speak with drug detectives about working as a confidential informant. Weber explained that people often can get their charges to go away by doing so. Guein responded that he didn't know anyone who sold drugs on the Kansas side of the state line, where these law-enforcement officers worked, but he wished he did so that he could take advantage of the offer.

Eventually, during a more thorough search of Guein's car, police found marijuana in a glass jar, rolling papers, a marijuana pipe, a wood grinder, and a box of plastic baggies. Police also found the remnants of several marijuana cigarettes in the ashtray.

The State charged Guein with possession of marijuana with the intent to distribute it, felony possession of drug paraphernalia, and misdemeanor possession of drug paraphernalia.

Guein filed a motion to suppress to prevent statements he had made and the evidence that had been recovered from being used against him at trial. The motion itself and the State's response were not included in the record on appeal, but we have a transcript of the evidentiary hearing the district court held on March 5, 2015. Weber, Larson, and Guein all testified, generally as we've described here. Guein argued that the court should suppress the statements he made both before and after he was given the *Miranda* warnings. He argued that his pre-*Miranda* statements should be suppressed because the officer had interrogated him while he was in custody without first informing him of his *Miranda* rights. He argued that his post-*Miranda* statements should be suppressed because the officer had threatened him by saying, "Don't fuck around with me and I ain't gonna fuck around with you," making him feel like he had to confess. Guein contended that the bag of marijuana and the items found in the car should also be excluded from trial because the police had discovered them by violating his constitutional rights when questioning him.

The State argued that the officers were justified in investigating further when they witnessed suspicious activity in a high-crime area and had probable cause to search the vehicle once they smelled marijuana in the car. The State maintained that Guein's pre-*Miranda* statements should not be suppressed because when the officer asked how much marijuana Guein had on him, Guein was not in police custody and was not yet required to be given the *Miranda* warnings. In regard to the post-*Miranda* statements, the State argued that Weber's alleged threat was simply a "be-straight-with-me speech," which is permissible, and not a threat, which isn't, so Guein's post-*Miranda* statements should not be suppressed as he had voluntarily waived his right to remain silent. The State also argued that because the loose marijuana was plainly visible through the window of the car, the officer had the right to conduct a search without a warrant independent of anything Guein had said. Finally, the State claimed that the marijuana in Guein's pants would inevitably have been discovered while Guein was being booked in jail and could, therefore, be used at trial.

10

The district court made an oral ruling at the close of the hearing. The court held that the police had the right to investigate upon witnessing Guein get into Gresham's car since it was late at night and in a high-crime neighborhood, "a zone where drug sales are taking place." The court concluded that the officers had the right to investigate further upon smelling the marijuana odor coming from the car. The court determined that Guein was in custody when he was handcuffed and should have been given the *Miranda* warnings; so it suppressed the statements Guein made from the time he was handcuffed until he was given *Miranda* warnings, but it allowed his statements from before being handcuffed to be used at trial.

In regard to the post-*Miranda* statements, the district court concluded that Guein had voluntarily waived his rights:

> "Second issue as to the post-*Miranda*. Once [Guein was] Mirandized in the vehicle, I don't find anything—I understand it's a difficult case and the circumstances—but I don't find anything that it was—that there was not an understanding by the defendant or that it was an involuntary waiver of *Miranda* and so I'm going to deny the defense motion to suppress any of the statements made after *Miranda* was given."

The district court also denied Guein's request to have the physical evidence (the marijuana baggie and the other items found in the car) suppressed "partially because of my ruling on the first issue on the pre-*Miranda* statements" and because the loose marijuana in the car was in plain view, which would have justified a search during which the police would have discovered the other evidence.

Guein's case then proceeded to trial. A jury found him guilty of possession of marijuana with the intent to distribute it and misdemeanor possession of drug paraphernalia but not guilty of felony possession of drug paraphernalia. The

11

district court sentenced Guein to 18 months on probation, but if Guein failed on probation he would serve the underlying sentence of 14 months in prison.

Guein has appealed to our court.

ANALYSIS

Before we get into the specifics of Guein's appeal, we should review the legal principles that will guide us. The case is here on Guein's appeal of the district court's denial of his motion to suppress certain evidence from being admitted at his trial. When we review a district court's decision on a motion to suppress, we first review the district court's factual findings to determine whether they are supported by substantial evidence. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015). Substantial evidence means legal and relevant evidence that a reasonable person would find adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012); *State v. Walker*, 283 Kan. 587, 594-95, 153 P.3d 1257 (2007). We then review the district court's ultimate legal conclusions independently, with no required deference to its conclusions. *Dern*, 303 Kan. at 392. We do not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in the evidence. 303 Kan. at 392.

When the significant facts are not in dispute, however, whether to grant or deny a suppression motion presents a question of law over which we have unlimited review. *State v. Stevenson*, 299 Kan. 53, 57, 321 P.3d 754 (2014); *State v. Garcia*, 297 Kan. 182, 187-88, 301 P.3d 658 (2013). Here, most of the evidence critical to the issues presented to us is not disputed—and no one contests that Officer Weber said the words that are recorded on video. Accordingly, we consider independently whether the "don't fuck with me" warnings Weber gave to Guein before providing the *Miranda* warnings warrant suppression of statements Guein made in response.

12

Guein makes three separate challenges to specific evidence against him. First, he argues that he was in custody—thus requiring that *Miranda* warnings be given—when the officer asked him whether he had marijuana on him. Because of that, he asks that the court exclude his statement that he had marijuana in his possession. Second, he argues that the officer didn't have valid reason to search his person, which is where the officer found a bag of marijuana. Because of that, he asks that the marijuana found on him not be allowed in evidence. Third, he argues that the officer's admonition that he not "fuck around with" the officer when asked questions negated the *Miranda* warning he was given so that his post-*Miranda* statements should not be allowed at trial. We will discuss each of these challenges separately.

I. *The District Court Properly Denied Guein's Request to Suppress Guein's Statements Made Before He Was Placed in Handcuffs Because the Encounter at That Point Was a Reasonable Investigatory Detention Similar to a Traffic Stop.*

Guein's first argument is that the statements he made before being handcuffed should be suppressed. As we have already noted, Guein admitted to having marijuana on him after Weber told Guein that he "reek[ed] of weed" and then asked him twice whether he had any. Guein argues that this statement can't be used against him because the officer didn't give him *Miranda* warnings before asking whether he had any marijuana.

Under the well-known rule in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996), police must provide several warnings to a suspect in custody before that suspect is interrogated. The rule helps to implement safeguards of the Fifth Amendment to the United States Constitution, which provides a right to remain silent about criminal wrongdoing. The *Miranda* warnings are familiar ones: that the defendant "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. Section 10 of the Kansas Constitution Bill of Rights has been interpreted to provide the same protection. *State v. Jones*, 283 Kan. 186, 194, 151

13

P.3d 22 (2007), *disapproved on other grounds by State v. Nelson*, 291 Kan. 475, 243 P.3d 343 (2010); *State v. Bordeaux*, 38 Kan. App. 2d 757, 759, 172 P.3d 78 (2007).

So two elements must be present for *Miranda* warnings to be required: interrogation and custody. Guein obviously was asked whether he had any marijuana on him; the only dispute in our case is whether he was "in custody" for *Miranda* purposes. That happens when a person is taken into custody or otherwise deprived of his or her freedom in a significant way. *Yarborough v. Alvarado*, 541 U.S. 652, 661, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004); *Bordeaux*, 38 Kan. App. 2d at 759-60.

At first, whether a person is in custody for *Miranda* purposes seems an easy question. The United States Supreme Court has described the essential question as whether, under the circumstances of the interrogation, a reasonable person would have felt that he or she could end the investigation and leave. *Alvarado*, 541 U.S. at 663; *Jones*, 283 Kan. at 193-94; *Bordeaux*, 38 Kan. App. 2d at 760. But other cases complicate the apparent simplicity of this test, in which we ask whether a reasonable person would have felt free to leave. That's because the Supreme Court has also recognized that there are some situations—like common traffic stops—in which a person may not truly be free to leave but still has not been "subjected to restraints comparable to those associated with a formal arrest," so *Miranda* warnings need not be given. *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); see also *Bordeaux*, 38 Kan. App. 2d at 760.

We note too that whether a person is in custody for *Miranda* purposes is determined under an objective test, not based on the specific understanding of the person whose freedom was restricted in some way. *Berkemer*, 468 U.S. at 441-42; *State v. Summers*, 293 Kan. 819, 826, 272 P.3d 1 (2012). Otherwise, officers in the field would not know how to guide their conduct. *State v. Morton*, 286 Kan. 632, 645, 186 P.3d 785 (2008); see LaFave, Israel, King & Kerr, Criminal Procedure § 6.6(c), pp. 373-75 (5th ed.

14

2009). Kansas courts have set out eight factors to consider, along with the other facts of each case:

> "Several nonexclusive factors may be considered when reviewing the totality of the circumstances surrounding a defendant's statements to determine admissibility, including: (1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers and defendant said and did; (5) the presence of actual physical restraint of the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or a witness; (7) how the defendant got to the place of questioning, that is, whether he or she came completely on his or her own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation—whether the defendant left freely, was detained, or was arrested."
> *Summers*, 293 Kan. 819, Syl. ¶ 3.

Here, while Guein was arrested after the interrogation and was being questioned as a suspect, the other factors generally do not suggest treating this as a custodial interrogation. The events were in a public place—a Burger King parking lot—and at the time Weber asked Guein whether he had any marijuana, there were only two officers present (which matched the number of suspects). Guein arrived there on his own, and he had not yet been physically restrained (though he was subjected to a pat-down weapons check for officer safety). And at the time Weber asked these questions, the interaction had only lasted a minute or two. In sum, this portion of the encounter was much like a traffic stop, ordinarily considered an investigatory detention not requiring *Miranda* warnings, at least in its early stages.

Guein cites this court's 2007 decision in *Bordeaux* in support of his position. But the facts in that case are quite different from the ones here. In *Bordeaux*, police ordered the defendant at gunpoint out of hiding in a small, dark storage shed behind a house. The officers—in an authoritarian way and with guns drawn—ordered the man to put his hands

15

on the shed so he could be patted down for weapons. And while that was in progress, an officer asked whether a coat linked to a suspicious person who had been in the area belonged to the man. In those circumstances—a man ordered out of hiding at gunpoint by multiple officers using strong vocal commands and ordering the man into an immobilizing position—we concluded the defendant was in custody for *Miranda* purposes. 38 Kan. App. 2d at 764-66.

While it's true that the questions at issue in both *Bordeaux* and our case were asked during the pat-down for weapons, the similarities pretty much end there. In *Bordeaux*, officers ordered the man out of hiding in a shed at gunpoint; here, Weber asked Guein to step out of the car with the officer's weapon in its holster. In *Bordeaux*, officers ordered the man to put his hands on the shed so he could be patted down; here, Guein agreed to the officer's request for a pat-down, and the officer asked permission to search inside Guein's pockets. Neither Bordeaux nor Guein was free to leave at the moment these questions were asked, but that's only one factor that a court looks at to determine whether *Miranda* advisories were required. Guein's freedom of movement was not curtailed to a degree associated with formal arrest: Being in custody for *Miranda* purposes is not the same as being detained briefly—without physical restraints—to answer a few questions in a public place. The district court did not err when it denied Guein's motion to suppress his statements that he had some marijuana on him.

II. *The District Court Properly Denied Guein's Request to Suppress Evidence of the Marijuana Found on His Person Because the Officer Had Probable Cause to Search Guein.*

Guein next argues that the evidence of the marijuana found on him should be suppressed because Officer Weber didn't have legal authority to search him for marijuana. The State argues that the officer had probable cause to search Guein because the officer detected the smell of marijuana coming from him.

16

The Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights protect the right of all of us to be free from unreasonable searches and seizures by the government. See *State v. Talkington*, 301 Kan. 453, 461-62, 345 P.3d 258 (2015); *State v. Karson*, 44 Kan. App. 2d 306, 307, 235 P.3d 1260 (2011), *aff'd* 297 Kan. 634, 304 P.3d 317 (2013). Caselaw interpreting the Fourth Amendment tells us that a search without a warrant is unreasonable unless it falls within one of several limited, well-defined exceptions to the warrant requirement. *State v. Sanchez-Laredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012); see also *State v. Mullen*, 304 Kan. 347, Syl. ¶ 2, 371 P.3d 905 (2016) (interpreting Section 15 of the Kansas Constitution Bill of Rights to provide the same protection as the Fourth Amendment to the United States Constitution). Getting a warrant requires a showing of probable cause to search or seize some specific person or place. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause . . . .").

Here, the State argues that the officer had probable cause to search accompanied by exigent circumstances, which is one of the warrant-requirement exceptions. *Sanchez-Laredo*, 294 Kan. at 55. By probable cause, we mean that a reasonable person would conclude that there is a fair probability that the place to be searched contains contraband or evidence of a crime. *Florida v. Harris*, 568 U.S. ___, ___, 133 S. Ct. 1050, 1055-56, 185 L. Ed. 2d 61 (2013); *Sanchez-Loredo*, 294 Kan. 50, Syl. ¶ 2. By exigent circumstances, we mean that the law-enforcement officer has a reasonable belief that there is a threat of imminent loss, destruction, removal, or concealment of the evidence or contraband. 294 Kan. 50, Syl. ¶ 3. As we have already noted, the Fourth Amendment usually requires a warrant, and warrants may only be issued on probable cause. So probable cause is required either to get a warrant or to apply this exception to the warrant requirement. The point of the exception for exigent circumstances is to allow an officer to search for something when the process of getting a warrant might allow the item to be hidden or destroyed.

The State has the burden to show that a warrantless search was lawful. *State v. James*, 301 Kan. 898, 908, 349 P.3d 457 (2015). Guein argues that Officer Weber didn't have probable cause to search him for drugs; thus, Guein contends, Weber couldn't direct that Guein give him the bag of marijuana Guein had hidden in his underwear. The State asks that we find that Weber had probable cause based solely on Weber's detection of the odor of marijuana on Guein. The State cites *State v. MacDonald*, 253 Kan. 320, Syl. ¶ 2, 856 P.2d 116 (1993), which held that the odor of marijuana, "standing alone, provides probable cause for a motor vehicle search." No Kansas case has applied the same rule to the search of a person. The State urges that we do so in this case, and it cites a number of out-of-state cases in support of that proposition.

But we need not address that question to decide whether Weber had probable cause to search Guein for marijuana. Weber had not only smelled marijuana on Guein's person—Guein had admitted he had marijuana on him. We have already concluded that Guein's admission that he had marijuana in his underwear is admissible, and Weber could rightly consider that admission in addition to the smell of marijuana. That gave Weber probable cause for the search; he had ample reason to believe that Guein had marijuana on him and to conduct the equivalent of a search by directing that Guein hand the bag over. Guein does not dispute that, given the possibility that a small amount of drugs could be hidden or destroyed, exigent circumstances were present. See *Illinois v. McArthur*, 531 U.S. 326, 331-32, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001); *State v. Fewell*, 286 Kan. 370, 384-85, 184 P.3d 903 (2008). The district court did not err in denying Guein's motion to prevent the admission of the bag containing marijuana into evidence.

III. *The District Court Erred in Denying the Motion to Suppress Guein's Post-*Miranda *Statements Because the Officer's Warning Not to "Fuck With" Him Was Threatening and Effectively Negated the* Miranda *Warning on the Facts Found Here.*

Guein's final argument is that Weber's statement constituted threats and promises that had a coercive effect on him, rendering his post-*Miranda* statements involuntary. When a defendant claims that statements made to police weren't voluntary, the State has the burden to show that the statement was the product of the defendant's free and independent will. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013).

In determining whether a statement is voluntary, courts look at all the circumstances, including a nonexclusive list of factors:

> """'(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.' [Citation omitted.]"'" *Randolph*, 297 Kan. at 326 (quoting *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1129 [2010]).

When considering these factors, a court looks at the situation in its entirety. Sometimes circumstances may lessen the importance of an individual factor that might otherwise have a coercive effect. But if a single factor or combination of factors """inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne . . . the confession was not therefore a free and voluntary act."'" *Garcia*, 297 Kan. at 188 (quoting *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 [2009]).

Before going further, we must consider how we should look at the underlying facts. In addition to the testimony we noted earlier in our opinion, Guein testified that he had taken Weber's statements as a threat of physical harm if Guein didn't tell Weber what

19

he wanted to hear. In addition, Guein testified that he had smoked marijuana earlier that day, which he said had made him "more paranoid and fearful with [the officers]."

The district court made no factual findings specifically related to this testimony from Guein. Regarding whether Guein's post-*Miranda* statements should be suppressed, the court said it was "a difficult case" but concluded "that there was not an understanding by the defendant or that it was an involuntary waiver of *Miranda* and so I'm going to deny the defense motion to suppress any of the statements made after *Miranda* was given." Neither party asked the district court to make any additional factual findings.

On appeal, we must accept the district court's factual findings, and when specific findings haven't been made and no party requested additional findings, we generally presume that the district court found whatever facts are supported by the evidence that would support its ruling. *Dern*, 303 Kan. at 394. Under that presumption, we would conclude that the district court apparently didn't believe Guein's testimony since it ruled against him. For that reason, we will not consider Guein's testimony that his impression of Weber's statements was affected by marijuana use that day or Guein's testimony about how he subjectively felt fear of physical harm when he heard Weber's statements. We will instead restrict our analysis to the words recorded on the videotape, taken in the context in which they were said. No one has disputed that the videotape accurately portrayed the conversation Weber had with Guein. And when we consider that conversation in context, we conclude that the State failed to meet its burden to show that the statements Guein made post-*Miranda* were voluntary.

Guein emphasizes the officer's admonition that Guein not "fuck around with" him and that if Guein complied, the officer would not "fuck around with" Guein—comments that were made while Guein was already handcuffed. Guein then argues, "The standard for a [non]coercive environment should rise far above a level where an individual needs

20

to fear what a law enforcement officer might mean by threatening to 'fuck around with' them." We agree.

Taken in context, a reasonable person would conclude that Officer Weber made an implied threat of physical violence and connected it to answering the questions Weber would soon be asking in a way that conformed with Weber's understanding. Weber advised Guein that he was "going to ask you some questions here in a little bit." Weber told Guein, "I know what you're doing out here." And Weber told Guein that if Guein didn't "fuck around with" him, then "I ain't gonna fuck around with you." Or, as Weber restated it, even though Guein had already said he understood the officer, "You don't screw around with me, I ain't gonna screw around with you."

To be sure, Weber left some ambiguity about whether he would *physically* harm Guein or just make the criminal process more difficult. After telling Guein not to "screw around with" him, Weber added, "I'm gonna do what I can to help you out, okay?" That and other comments suggested that Weber would try to help Guein in the criminal process if Guein cooperated (by answering Weber's questions in a way Weber thought truthful) and that Weber would not help him in that way if Guein didn't cooperate (by not answering or not answering truthfully).

But in context, a reasonable person would be concerned about possible physical harm from Weber's comments. Weber made them forcefully. Weber made them only after Guein's hands were handcuffed behind his back, leaving him vulnerable to physical violence. And Weber then left Guein handcuffed in the police car for about 10 minutes to think this over before giving him his *Miranda* warnings.

The context of those *Miranda* warnings is also important in determining whether the State showed that Guein's post-*Miranda* statements were voluntarily made. When Weber said he was going to read Guein his rights, he said, "I've gotta do it because you're

21

in handcuffs." He then read through them at a rapid pace before asking, "And with those rights in mind, do you want to talk to me?" Given the comments Weber had already made before putting Guein in the police car, quickly reading the *Miranda* rights because "I've gotta do it" would not have been sufficient to overcome the implied threat of physical harm already put in place if Guein didn't answer the officer's questions in a way that was consistent with Weber's expectations. Accordingly, Guein's post-*Miranda* statements should not have been admitted: "An extrajudicial confession will not be received into evidence unless it has been freely and voluntarily made, and if the confession has been extorted by fear . . . , it will be excluded as involuntary." *Garcia*, 297 Kan. 182, Syl. ¶ 5.

The State notes that Guein is a college-educated man who brought a gun with him while meeting up with someone to sell marijuana. Based on these facts, the State argues, Guein would not have been affected by the use of foul language. The State misses the point with this argument. The use of profanity here simply amplified the serious nature of the statements being made, as the use of any particularly strong language, forcefully said, might do. It's only because that language was accompanied by words conveying additional messages—that Weber was going to be asking questions, that Weber expected cooperation when he did so, and that Weber might "fuck with" Guein if he didn't cooperate—that tip the balance here strongly in Guein's favor when we consider whether the State proved the statements were made voluntarily.

The district court in this case considered the voluntariness question to be "a difficult case" but ultimately concluded the statements were voluntary. Although the district court here didn't set forth a detailed analysis of the issue, we suspect that its review was like that of the district court in *State v. Stone*, 291 Kan. 13, 237 P.3d 1229 (2010), and, one might argue, that of the dissent in our case, which separately reviews each listed factor. In *Stone*, the district court gave separate consideration to each of several factors that might have made the defendant's statements involuntary and found each of them insufficient—when considered separately. The Kansas Supreme Court

22

reversed, finding that the effect of all of the factors when taken together required that the court conclude that the confession was involuntary, even though the defendant had been read his *Miranda* rights. The court's conclusion in *Stone* seems applicable here as well:

> "While any one of the circumstances surrounding this interrogation, standing alone[,] . . . might not have led us to conclude [the defendant's] statements were coerced, a review of the audio recording taking into account all of these circumstances . . . leads us to conclude as a matter of law that [the defendant's] statements were not the product of his free and independent will and that it was error to admit them at trial." 291 Kan. at 32-33.

Guein also argued that the statements should be considered involuntary because of promises Weber made. The State suggests that in the district court, Guein argued only that Weber's statements constituted a threat—and not that they promised any sort of benefit in exchange for his statements to the officer. Accordingly, the State suggests that we cannot consider on appeal the argument that Weber offered anything to induce Guein's statements. But Guein's attorney characterized Weber's statements as a "converse threat and a promise," and Guein testified that he understood that he should "[t]ell [Weber] what he wanted to hear and hopefully this will work out for me." So Guein made a sufficient argument in the district court for him to pursue the claim on appeal that Weber's statements were both a threat and a promise sufficient to override his free will.

Even so, we do not find his argument that his statements were induced by a promise persuasive. Weber's only "promise" was that he would "do what I can to help you out" if Guein cooperated. We do not consider that a sufficient promise of action that it would have likely induced Guein to make false statements in response. See *Garcia*, 297 Kan. 182, Syl. ¶ 6; *State v. Johnson*, 253 Kan. 75, 84, 853 P.2d 34 (1993) (holding that officer's alleged implied promise that if defendant cooperated he could receive a lesser sentence was not so coercive as to make a confession involuntary); *United States v. Binford*, 818 F.3d 261, 271-72 (6th Cir. 2016) (stating that promises merely to recommend leniency in exchange for cooperation generally are not so coercive as to

23

make a confession involuntary), *cert. denied* 2017 WL 69193 (2017); *United States v. Alvarez*, 142 F.3d 1243, 1248-49 (10th Cir. 1998) (holding that an officer's stated intention to recommend a lesser sentence in exchange for defendant's response to questions did not constitute a promise of a lesser sentence so as to make defendant's statements involuntary).

The dissent argues that we haven't applied each of the factors a court must consider when determining whether a statement was voluntarily made. To be sure, we haven't discussed each of them separately, though we have noted that Guein is a college-educated man, and we have not suggested he failed to hear or understand the words used by Officer Weber. But the list of factors itself is a nonexclusive list; the court must consider all of the circumstances. We have carefully done that, and we have explained in our opinion the circumstances that led us to conclude that Guein's post-*Miranda* statements were not made voluntarily.

The dissent also raises an additional argument the State did not—that Guein did not make the claim on appeal that his statements were improperly coerced by a threat of physical harm. We would first note that Guein specifically testified in the district court that he feared physical harm from Officer Weber:

> "Q. And did you think that there was consequences—what did you think when he used the cuss word 'F around,' what did you think he was saying would happen or what could happen if you didn't tell him what he thought was going on there?
> "A. I thought there was going to be harm caused to me.
> "Q. And what kind of harm?
> "A. Physical harm."

We haven't dwelt on Guein's testimony about his subjective impressions since our decision is based on the meaning anyone in his situation would place on the words Weber

used. But Guein's attorney surely argued to the district court that the post-*Miranda* statements should be suppressed because threats were made by Weber:

"[Y]our Honor, I think the most important evidence that should be suppressed is from the . . . post-*Miranda* admissions. I think it's very clear[] that it was an intentional threat made by the officer [and] that it was designed to make it more likely that he wouldn't pay any attention to the advising of the rights that he would be given."

And on appeal, Guein's attorney again has argued that Guein's statements were coerced by threats:

"Marcus could only speculate as to how severely the officer would 'fuck with' him if he did not comply with the officer's demands. In any case, the answer to this issue should not require an analysis into Marcus' subjective belief as to just how far the officer would go with his threats to 'fuck with' Marcus. It is enough that the officer made the threat, 'Don't fuck around with me, and I ain't going to fuck around with you, okay?'

"Officer Weber's statements blur the line between promise and threat, but, however they are classified, were certainly intended to elicit an incriminating response[.]

. . . .

"At the time Marcus heard these threats he was bound by handcuffs and on the way to the back of a law enforcement SUV headed for jail to be booked."

In sum, Guein has adequately raised and argued the claim that his statements were coerced by threats, and we have concluded that his argument was well taken.

Having determined that Guein's post-*Miranda* statements should not have been admitted at trial, we must still consider whether the error was harmless: "[E]ven an error that infringes upon a constitutional right may be declared harmless if the benefitting party proves beyond a reasonable doubt that the error did not affect the outcome of the trial in

light of the entire record." *Garcia*, 297 Kan. at 197. The State notes that there was other evidence that Guein had planned to pass or sell marijuana to someone else, qualifying as distribution under Kansas criminal law. See K.S.A. 2015 Supp. 21-5705(d)(2)(A). But the State has not included the trial transcript in the record on appeal. Without it, we are not able to fairly judge how important Guein's statements were in convicting him of distribution and, thus, whether this error was harmless. Even with respect to Guein's conviction for possession of drug paraphernalia, which may well have been proved with overwhelming evidence, we can't tell what evidence was used to show that Guein possessed the items in the absence of the trial transcript. Accordingly, we must set aside Guein's convictions and order a new trial.

The district court's judgment is reversed, and the case is remanded to the district court for further proceedings.

\* \* \*

GARDNER, J., dissenting: I respectfully dissent. I agree with the majority's conclusions on the first two issues but do not agree that the post-*Miranda* statements should be suppressed. I would affirm.

*Our scope of review is substantial competent evidence*

Our scope of review on this issue is well established.

> "[T]he determination that a statement was freely, voluntarily, and intelligently given will be upheld if there is substantial competent evidence to support such a conclusion. In making the factual review, the appellate courts will not reweigh the evidence and will give deference to the factual findings of the trial court. The legal conclusion drawn from those facts is subject to de novo review." *State v. Holmes*, 278 Kan. 603, 612, 102 P.3d 406 (2004).

Substantial evidence in this case supports the conclusion that Guein's statement that he had purchased the marijuana for $25 and intended to sell it to Gresham for $50 was freely, voluntarily, and intelligently given. I would reach the same conclusion, however, if our review of the evidence were de novo.

*Several factors guide the determination of voluntariness*

In considering the totality of the circumstances, we examine both the conduct of the officers and the characteristics of the accused. The majority's opinion, however, makes no effort to apply the factors it concedes should be considered in determining whether Guein's statement was voluntary. Those factors are:  Guein's mental condition; the manner and duration of the interrogation; Guein's ability to communicate on request with the outside world; Guein's age, intellect, and background; the fairness of the officers in conducting the interrogation; and Guein's fluency with the English language. *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010). Although these factors are nonexclusive, they are not to be ignored.

We are not to weigh the factors in the balance, one against another, to see whether the scales tilt in favor of or against voluntariness.

> """[T]hese factors are not to be weighed against one another . . . , with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." [Citations omitted.]'" *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013) (quoting *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 [2009]).

27

The totality of the circumstances shows that Guein's post-*Miranda* statements were not coerced but were the product of his free and independent will.

*Guein's age, intellect, and background*

Guein was 27 years old at the time of his arrest. He had graduated from college in 2010 with a Bachelor's degree in mass communications from Jackson State University. He was born in Kansas City and lived there until his sophomore year in high school, then graduated from high school in Atlanta, Georgia. He was employed at one or more jobs at the time of his arrest. He had very little experience with police but lived in an area of Kansas City that he admitted some considered to be a "hood area." He also admitted that he smoked marijuana daily.

*Guein's fluency with the English language*

The videotape and the trial transcript demonstrate that Guein, a college graduate who grew up in urban areas of the United States, is fluent in English.

*Guein's mental condition*

Guein does not contend that he had any mental problems, and the evidence reflects none. The videotape demonstrates that Guein was sober and was able to respond appropriately to the officer's questions. The officer testified he had no reason to believe Guein was under the influence of drugs or alcohol.

*Guein's ability to communicate on request with the outside world*

At the time of the post-*Miranda* questioning, Guein was under arrest and was sitting in the back of the officer's vehicle, waiting to go to jail. At some point during that time, Guein told the officer he was nervous and asked if he could call his "lady friend" because she was expecting his return. The officer told Guein they would get everything "squared away" but it would take a few minutes and told Guein to "sit tight."

Guein was, however, permitted to call his "lady friend" from jail and thus was not held incommunicado. When she asked him what he had been thinking, he responded: "I mean, I smoke, and so a friend asked me, could he just get it from me instead of having to do the run-around and get it from somebody else. I'm like, yeah, that's cool and I just got caught up in the process."

*The manner and duration of the interview*

The officer's profane statements were made approximately 10 minutes before Guein was given the *Miranda* warnings and chose to speak. During those 10 minutes, Guein was by himself and was not subject to any statements from anyone. He thus had time to reflect upon his predicament and to consider what was in his best interests. The post-*Miranda* interview did not include any allegedly coercive statements.

The post-*Miranda* interview, approximately 10 minutes after the officer's profane statements, lasted a little over 5 minutes. During that conversation, Guein acknowledged that he had purchased the marijuana for $25 and intended to sell it to Gresham for $50. However, much of the discussion did not directly relate to Guein's possession of drugs, but to Guein's possession of a handgun, the procedure for getting out of jail, and the possibility that Guein could become a confidential informant. No protracted questioning occurred, unlike in *People v. Quan Gim Gow*, 23 Cal. App. 507, 511, 138 P. 918 (1913),

29

where "the repeated questioning of the officers, like the constant dropping of water upon a rock, finally wore through his mental resolution of silence."

The videotape captures the cadence, tone, and inflections of the officer's questions and Guein's responses. That tone is conversational, not confrontational. The officer's statements are not loud or threatening, and Guein's responses are prompt, unwavering, and do not otherwise reflect being intimidated.

The majority apparently finds it suspect that Guein was in handcuffs when questioned. Yet all post-*Miranda* interrogations necessarily occur only when a defendant is in custody and is thus deprived of his or her freedom in a significant way. Absent other indicia of coercion, the fact that a defendant is handcuffed pursuant to routine arrest procedures during a post-*Miranda* interview carries little, if any, weight in determining the voluntariness of a statement.

It is also immaterial that before reading Guein his rights, the officer said, "I've gotta do it because you're in handcuffs," then read the *Miranda* warnings rapidly. Guein, an intelligent college graduate, stated his understanding of his rights and his desire to speak with the officer immediately after they were read to him, demonstrating no confusion or indecision. Guein never alleges he did not hear or fully understand his rights, nor does the officer's statement that he had to read them to Guein because Guein was in custody somehow dilute or negate them. Nothing in the manner or duration of the post-*Miranda* interview is coercive.

*The officer's fairness in conducting the interview*

Guein alleges no unfairness in the officer's post-*Miranda* interview itself, and the videotape demonstrates none. The record reflects no endeavor to wring out a confession

30

when it was apparent that Guein was not disposed to make one. The officer used no profanity or arguably threatening language during his custodial interrogation.

Instead, the sole alleged unfairness arises from the officer's pre-*Miranda* profanity which the majority finds apparently tainted his post-*Miranda* questioning. But Guein admitted that he uses the same profane word the officer used, apparently with his friends. And the record shows that Guein used that same profanity in responding to the officer's profane statements. See *State v. McCullers*, 341 N.C. 19, 460 S.E.2d 163 (1995) (finding defendant's claim that he was intimidated or coerced by detective's profanity not persuasive in light of profanity in defendant's own response to question).

Use of profanity is commonplace in our ever-coarsening society, as one judge noted in addressing whether its use constitutes "fighting words":

> "Are we to assume that our society is composed of thin-skinned individuals ready to strike back at the hint of an abusive epithet? No longer are the words of the rough, coarse and uncivilized confined to their likes. They are part of the working vocabulary of many in our society. To be a member of our society is to be familiar with them, to overhear them used and endure whatever offensiveness it might cause so long as the situation is not one in which the words become a call to combat." *State v. Brahy*, 22 Ariz. App. 524, 529, 529 P.2d 236 (1974) (Donofrio, J., dissenting).

Although we do not condone the officer's use of profanity, given Guein's background and his use of the identical language, the officer's language was no more coercive to Guein than had the officer said, "Don't mess around with me. I won't mess around with you."

I thus agree with the majority that the officer's use of profanity does not, by itself, render Guein's statements involuntary. Although our cases have not directly addressed the impact of an officer's use of profanity, cases from other jurisdictions reflect that profane statements are weighed in the balance and are not necessarily coercive. *Cage v.*

*State*, 285 Ark. 343, 686 S.W.2d 439 (1985) (finding defendant's confession voluntary despite allegation of officer's use of profanity toward him which did not amount to undue mental pressure); *People v. Macias*, 2015 IL App (1st) 132039, ¶ 63, 36 N.E.3d 373 (finding defendant's confession voluntary despite an aggressive, confrontational interrogation that included yelling, profanity, and vulgarity); *Kolojaco v. State*, No. 14-99-00957-CR, 2000 WL 1752856, at *5 (Tex. App. 2000) (finding officer's statement about the photo of complainant's corpse and use of profanity which upset appellant did not rise to the level of coercive conduct that rendered appellant's confession involuntary).

The majority, however, finds Guein's statements coerced or involuntary because the officer's profanity "accompanied" three messages: that Weber was going to be asking questions; that Weber expected cooperation when he did so; and that Weber might F--- with Guein if he didn't cooperate. No explanation or citation to authority is offered in support of this unwarranted conclusion.

The first two of these "messages" are innocuous. An officer's statement to a suspect that the officer is going to be asking questions and expects cooperation is not coercive. Our courts do not find confessions involuntary based on an officer's encouraging the accused to tell the truth. *State v. Swanigan*, 279 Kan. 18, 33-34, 106 P.3d 39 (2005) (asking whether law enforcement's coercion of an involuntary statement in the first interrogation tainted the voluntary statements obtained in a subsequent interrogation):

> "This court has held that, without more, a law enforcement officer's offer to convey a suspect's cooperation to the prosecutor is insufficient to make a confession involuntary. *State v. Banks*, 260 Kan. 918, 924, 927 P.2d 456 (1996) ('it will be noted by the authorities that you did cooperate'); *State v. Johnson*, 253 Kan. 75, 82, 853 P.2d 34 (1993) (law enforcement officer stated he would go to the district attorney and tell him if the person was cooperating); *State v. Harwick*, 220 Kan. 572, 575-76, 552 P.2d 987 (1976). Likewise, we have declined to find a confession involuntary when the police

encourage the accused to tell the truth. *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981); *State v. Tillery*, 227 Kan. 342, 344, 606 P.2d 1031 (1980); *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 (1900) ('mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent')." *Swanigan*, 279 Kan. at 33-34.

Only the last of the officer's three "messages" is arguably coercive—the officer's statements: "Don't F--- around with me and I ain't gonna F--- around with you, okay?" "You don't screw around with me, I ain't gonna screw around with you. I'm gonna do what I can to help you out, okay?" For purposes of propriety and convenience, I refer to these as the officer's "profane statements." I agree with the majority's tacit conclusion that the profane statements are not an express threat but disagree that they constitute an implied threat.

The officer testified at trial that by making the profane statements he was only trying to get Guein to be honest with him and that he felt it was appropriate to use profanity in dealing with a suspected drug dealer. He made the profane statement after telling Guein "now is the time to be honest with me." After Guein waived his *Miranda* rights, the officer reiterated that purpose by saying he knew what was going on and didn't need Guein to tell him, but he wanted to give Guein the opportunity to be honest. As the majority concludes, the district court apparently credited the officer's testimony so we do too; thus, we attribute no nefarious motive to the officer.

At trial, when Guein's attorney asked the officer what he meant by the profane statements, the officer explained he meant he had discretion to add charges and could talk to the prosecutors about whether a defendant deserved leniency based on cooperation with police. Pursuant to the authorities noted above, such a statement is not coercive.

The majority misstates the officer's statement as: *If* you F--- with me, *then* I *will* F--- with you. But the majority has interjected the italicized words. The officer never said

33

them. His statement was not phrased as an "if, then" conditional threat. Instead, both times the officer made such a statement, he stated it as two independent clauses—once joining the clauses by the word "and," and once stating them as two separate sentences. He said, "Don't F--- around with me and I ain't gonna F--- around with you." The officer never said, "I will F--- with you." Instead, he said he would *not* do so, "I ain't gonna F--- around with you . . . ." Only by transposing the words to their converse and by adding the words "if" and "then" does the majority find the profane statements implied a threat. One could more reasonably interject the conjunction "because" between the two statements, making it read: "Don't F--- with me because I won't F--- with you." Neither the words actually stated by the officer, the implications reasonably flowing from them, nor the circumstances accompanying them shows the officer made an implied threat.

The majority reaches even further to find the officer's profane statements implied a *threat of physical harm* to Guein if he did not answer the officer's questions. That conclusion is not supported by citation to authority interpreting similar language that way, or to any evidence in this case suggesting that conclusion. The only testimony to that effect was Guein's, which the majority properly declined to consider since the district court evidently found it not credible.

Moreover, Guein never argues on appeal that the officer threatened physical harm. Instead, he admits that the officer's profane statements "could *only* mean" something else:

> "[T]hese statements could only mean that in exchange for [Guein's] cooperation Officer Weber would use his official power to benefit Marcus. Whatever Officer Weber intended to provide as quid pro quo, [Guein] properly understood cooperating meant obtaining the benefit of what Officer Web[]er could do to 'help [him] out.'
>
> ". . . By this, [Guein] properly understood, as any reasonable person would, that if he did not confirm the officer's predetermined conclusions about the situation the officer would do something that would be bad for [Guein]."

34

Guein's brief alludes to the officer's "ability to exercise mercy and look the other way" and to his perceived "authority to grant immunity" but does not allege or allude to any negative consequence other than the nebulous "something . . . bad" stated above. We do not address on appeal issues incidentally raised but not argued. *In re Rausch*, 272 Kan. 308, 327, 32 P.3d 1181 (2001), *reinstatement granted* 277 Kan. 658 (2004). Here, no threat of physical harm is even mentioned, let alone argued, in Guein's brief. This court should not rediscover arguments that parties have abandoned or create those never raised.

However, even if one reads the profane statements to mean that the officer would somehow punish Guein if he didn't cooperate, that tactic is solely one factor that cuts against the State. It does not make the confession involuntary per se.

> "[W]e fail to see how law enforcement can be required by *Miranda* to advise [a suspect] of his right to remain silent, and then can be allowed to warn him of punishment for his 'noncooperation' when he exercises that right. Accordingly, we need not determine whether this tactic otherwise constitutes a 'threat' under K.S.A. 2004 Supp. 60-460(f). On the other hand, we do not regard this tactic as one which makes the confession involuntary per se, but rather as one factor to be considered in the totality of circumstances. See, *e.g.*, *Tuttle*, 650 N.W.2d at 35; *Passama*, 103 Nev. at 214." *Swanigan*, 279 Kan. at 36-37.

Worse tactics commonly withstand allegations of coercion. See, *e.g.*, *State v. Harris*, 293 Kan. 798, 811, 269 P.3d 820 (2012) (confession may be voluntary even when officers lie to defendant during an interview); *State v. Wakefield*, 267 Kan. 116, 126-28, 977 P.2d 941 (1999) (deceptive interrogation techniques do not establish coercion but are one circumstance that must be viewed in conjunction with the others present to assess totality of the circumstances). See generally *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) ("*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a

35

fellow prisoner. . . . Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."). The tactic used by the officer here is not coercive.

The totality of the circumstances shows that Guein's statements were freely and voluntarily made and that his will was not overborne by any implied threat that the officer would somehow punish Guein if he didn't cooperate. See *Sharp*, 289 Kan. at 81 (noting dissipation of the import of an individual factor that might otherwise have a coercive effect).

*Conclusion*

Coercive government activity is necessary to finding that a confession was not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015); *State v. Stone*, 291 Kan. 13, 32-33, 237 P.3d 1229 (2010); *Swanigan*, 279 Kan. at 39.

> "'The sole concern of the Fifth Amendment, on which *Miranda* was based, is *governmental* coercion. See *United States v. Washington,* 431 U.S. 181, 187 (1977); *Miranda*, *supra*, 384 U.S., at 460. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than *official* coercion." *Oregon v. Elstad*, 470 U.S. 298, 305 (1985).' (Emphasis added.) 479 U.S. at 170." *State v. Brown*, 286 Kan. 170, 174, 182 P.3d 1205 (2008) (quoting *Connelly*, 479 U.S. at 170).

Guein was no monk cloistered in a monastery. Although the officer's profane statements may have had a coercive effect on some hypothetical person, the facts do not show the statements had any such effect on Guein. Instead, the facts weigh heavily in favor of finding that Guein's statement that he had purchased the marijuana for $25 and intended to sell it to Gresham for $50 was the product of Guein's free and independent

will. Because substantial evidence supports the district court's finding that the State met its burden of proof as to voluntariness, I would affirm.