(172 P.3d 78)
No. 98,161

STATE OF KANSAS, *Appellant*, v. ANTHONY DEMONDE BORDEAUX, *Appellee*.

Opinion filed December 7, 2007.

*Amy L. Aranda,* assistant county attorney, *Vernon E. Buck,* county attorney, and *Paul J. Morrison,* attorney general, for appellant.

*Stephen J. Atherton,* of Atherton & Huth, of Emporia, for appellee.

Before GREENE, P.J., MALONE and LEBEN, JJ.

LEBEN, J.: Anthony Bordeaux was ordered at gunpoint to come out of an open garden shed in which he was hiding. The shed was located behind a mobile home; an owner of a neighboring lot in the mobile-home park had called police to investigate a suspicious man wearing blue jeans, a black coat, and a black stocking cap. Once Bordeaux came out of the shed, the officer ordered him to put his hands on top of the shed so that the officer could conduct a pat-down for weapons. Bordeaux refused this order at least twice before complying, the officer's demands presumably becoming more and more insistent until Bordeaux complied. While one officer was conducting the pat-down—perhaps with Bordeaux already in handcuffs—another officer grabbed a black coat from inside the shed and asked Bordeaux whether it was his coat. Bordeaux admitted that it was.

This case was in district court because drugs were found in the coat. The case is in the Court of Appeals because the district court suppressed Bordeaux's statement admitting ownership of the coat, and the State has appealed. The district court's ruling was based on violation of the well-known rule in *Miranda v. Arizona,* 384

U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), which precludes police interrogation of suspects in custody unless several warnings are given as a procedural safeguard. We agree with the district court that Bordeaux, who was in the midst of a pat-down search immediately after being held at gunpoint, was in custody for purposes of *Miranda*. We also agree with the district court that the officer interrogated him when he asked Bordeaux the question. We therefore affirm the district court's judgment suppressing Bordeaux's response during the impermissible custodial interrogation.

On appeal, we review the factual findings of the district court to be sure that they were supported by substantial competent evidence. The legal conclusions drawn from those facts, including whether a person was in custody at the time of an interrogation, are subject to de novo review, and no deference is owed to the legal conclusions of the district court. *State v. Jones*, 283 Kan. 186, 192, 151 P.3d 22 (2007).

The State has challenged both prongs of the district court's *Miranda* analysis. First, the State argues that Bordeaux was not in custody. Second, the State argues that he was not interrogated.

*Bordeaux Was in Custody for* Miranda *Purposes When He Was Being Patted Down Immediately After Having Been Ordered Out of Hiding at Gunpoint.*

*Miranda* warnings are necessary to satisfy the requirements of the Fifth Amendment to the United States Constitution, which provides a right to remain silent about possible criminal wrongdoing and thus avoids coerced statements and confessions. See *Dickerson v. United States*, 530 U.S. 428, 147 L. Ed. 2d 405, 120 S. Ct. 2326 (2000). The *Miranda* warnings are familiar to all: that the defendant "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. Section 10 of the Kansas Constitution Bill of Rights has been interpreted to provide the same protection. *Jones*, 283 Kan. at 194.

The *Miranda* opinion held that its rule applied when a person had "been taken into custody or otherwise deprived of his freedom

of action in any significant way." 384 U.S. at 444. Later cases have established two essential inquiries for determining whether someone is in custody under *Miranda*. First, what were the circumstances surrounding the interrogation? Second, under those circumstances, would a reasonable person have felt that he or she could terminate the investigation and leave? *Yarborough v. Alvarado*, 541 U.S. 652, 663, 158 L. Ed. 2d 938, 124 S. Ct. 2140 (2004) (citing *Thompson v. Keohane*, 516 U.S. 99, 133 L. Ed. 2d 383, 116 S. Ct. 457 [1995]); *Jones*, 283 Kan. at 193-94 (citing *Thompson*).

But other cases complicate the apparent simplicity of the test of whether or not a reasonable person would feel free to leave. In *Berkemer v. McCarty*, 468 U.S. 420, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984), the Court ruled that *Miranda* warnings were not required when a person was questioned in a routine traffic stop. The Court recognized that "a traffic stop significantly curtails the 'freedom of action' of the driver," 468 U.S. at 436, which would seem to trigger the requirement of *Miranda* warnings as the test had been stated in *Miranda*. The Court nonetheless concluded that *Miranda* warnings were not required because most people know that traffic stops are ordinarily brief and because most such stops occur in public areas, so that the motorist would not feel "completely at the mercy of the police." 468 U.S. at 437-39. According to *Berkemer*, the proper question was "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." 468 U.S. at 437. The Court summarized later in *Berkemer* that when a suspect is "subjected to restraints comparable to those associated with a formal arrest," *Miranda* warnings must be given. 468 U.S. at 441.

*Berkemer* decided that the principles of *Miranda* apply even to traffic stops, and that a routine traffic stop—in which *Miranda* warnings are not required—may rise to the level where the motorist is "for practical purposes" in custody, which would require *Miranda* warnings. 468 U.S. at 440. Whether *Miranda* warnings are required must be decided on a case-by-case basis, and the *Berkemer* opinion correctly recognized the implication of this: "the police and lower courts will continue occasionally to have difficulty

deciding exactly when a suspect has been taken into custody" under this rule. 468 U.S. at 441.

We turn to the two essential inquiries for determining *Miranda* requirements armed both with the tests as currently phrased in *Yarborough* and *Jones* and with the knowledge that our analysis must consider the principles behind the rules. We first ask: what were the circumstances surrounding the interrogation?

As to this inquiry, we defer to the district court to find the facts. At the district court, the State has the burden to prove the lawfulness of the officer's actions by a preponderance of the evidence. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). We then review that evidence to determine whether there is substantial competent evidence to support the trial judge's findings. *Jones*, 283 Kan. at 194. And here we find an issue that requires some careful review.

The district court found as a fact that Bordeaux had already been handcuffed at the time that he was asked about the coat. We think it quite clear that a person who was ordered out of hiding in a dark shed and then handcuffed immediately is in custody for *Miranda* purposes. See *State v. Payne*, 273 Kan. 466, 468, 478, 44 P.3d 419 (2002) (holding that a person taken from a car at gunpoint, placed on the ground, and handcuffed was in custody for *Miranda* purposes). But the State cites evidence in its brief that supports its argument that Bordeaux was not placed into handcuffs until *after* he had been asked about the coat, and the defendant's brief does not challenge this assertion. Still, it is the district court's obligation to make factual findings based upon the evidence presented directly to it, and it is our obligation to uphold the district court's factual findings when they are supported by substantial competent evidence.

The district court announced its findings orally after it took a recess to review the evidence. The court specifically found that "[w]hile [one officer] had handcuffed the individual we now know to be the defendant, another officer then arrived, looked inside of the storage shed, and found a black coat and almost immediately asked the defendant if that was his coat, and the defendant so indicated that it was." Under these facts, the court concluded that

"[t]here is no question but what the defendant was in custody and that this was a custodial interrogation."

Two officers played the key roles here. Officer Robert Shipley found the defendant hiding in the storage shed, ordered him out of the shed at gunpoint, handcuffed him, and patted him down. Officer Scott Jones found the coat in the shed and asked the defendant about it. Two other witnesses, Officer Kelly Davis and Doug Crisp, also testified at the hearing, but neither saw Bordeaux handcuffed or asked about the coat. The defendant did not testify, so the evidence supporting the district court's factual finding must come primarily from the testimony of officers Shipley and Jones. We have reviewed their testimony in detail.

Officer Shipley's testimony can be interpreted either as suggesting that Bordeaux was handcuffed before he was patted down or as suggesting that he was patted down before he was handcuffed. Some of the answers given by Shipley were not in strict chronological order, and neither of the attorneys asked questions to clarify the time sequence. For example, in one answer on direct examination, Shipley talks about having Bordeaux step out of the shed and then doing a pat-down: "I had him step out and I did a quick pat-down on him, make sure there wasn't any weapons on his person." Later in the same answer, however, Shipley backtracks to talk about commanding Bordeaux multiple times to put his hands on top of the shed, which was a precursor to the pat-down. Shipley concludes with a statement that he put Bordeaux into handcuffs as soon as he put his hands on the shed: "[H]e finally put his hands up on the shed. Then I placed him in cuffs from that point."

Shipley used handcuffs because Bordeaux "was actively searching the area," and Shipley concluded that Bordeaux "was trying to find a way to run." Shipley noticed this *before* he conducted the pat-down: "I was trying to get him turned around so I could do my pat-down. He . . . was trying to find a way, his head was moving left and right, trying to find—to get—to look for a path to get away from me." Shipley put Bordeaux into handcuffs to "figure out who he was and what [Shipley] was dealing with."

The defense attorney asked in cross-examination if the pat-down occurred "immediately" after Shipley got Bordeaux out of the shed;

Shipley interjected that the pat-down only occurred after Bordeaux put his hands on top of the shed. But Shipley had previously said that when Bordeaux had "finally" put his hands on top of the shed, Shipley had "then" placed him in handcuffs "from that point" because Bordeaux was looking for an escape route. Shipley also agreed with the defense counsel that Shipley "had restrained [Bordeaux] effectively from the moment [Shipley] got him out of the shed." Under Shipley's testimony, the pat-down could have occurred with the defendant's hands on top of the shed, or it could have occurred with him already in handcuffs.

Officer Jones testified that he asked about the coat while Bordeaux was being patted down and before he was handcuffed. But the district court found otherwise, and an appellate court may not reweigh the evidence, determine witness credibility, or resolve conflicts in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006). In this appeal, we view the evidence in the light most favorable to the defendant, who prevailed below. See *State v. Hardyway*, 264 Kan. 451, 459, 958 P.2d 618 (1998).

On the evidence presented to the district court, either Bordeaux was handcuffed before he was patted down or he was patted down before he was handcuffed. These are mutually exclusive events, so evidence that makes one scenario unlikely may provide substantial evidence that the other scenario took place. And there is substantial evidence that makes the sequence of events testified to by Jones an improbable one. Jones testified that he was not even present near the shed when Bordeaux was forced out into the open, and the events testified to by Shipley appear to have transpired quite quickly from that moment until Bordeaux was handcuffed. For Jones to have asked about the coat before Bordeaux was handcuffed, the period during which Shipley confronted Bordeaux outside the shed before handcuffing him had to last long enough for Jones to enter the area, enter the shed, make sure there was no one else in the shed, find the coat, come back out of the shed, and then ask Bordeaux about the coat. The district court's finding that Bordeaux was already in handcuffs when Jones asked about the coat is a reasonable judgment—the alternative scenario would require that all of the lengthy sequence of events described above

had taken place while Shipley left Bordeaux unrestrained despite his concerns that Bordeaux was looking "for a path to get away" before the pat-down.

At the end of the evidentiary hearing, the district judge took a recess to review the evidence and to consider his decision. He returned to the courtroom and announced that he would make "some very detailed factual findings," further indicating that he had carefully considered the findings that he then announced. While there is certainly evidence in the record from which one could conclude that Jones asked about the coat before Bordeaux was handcuffed, there is substantial evidence in the record to support the factual finding of the district court. When there is substantial evidence to support the district court's factual findings, we must accept them even though there may be contrary evidence. *State v. William*, 248 Kan. 389, 411, 807 P.2d 1292 (1991).

Analysis of the second essential *Miranda* inquiry—whether a reasonable person would have felt free to terminate the investigation and leave—is uncomplicated when one accepts the district court's factual finding that Bordeaux had been handcuffed shortly before Jones asked about the coat. *Miranda* recognized that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Bordeaux had been forced at gunpoint out of hiding in a small dark shed, then handcuffed. A pat-down was in progress. No time had gone by in which the pressure inherent in this situation dominated by police force and physical restraint might have dissipated. We therefore conclude that Bordeaux, who was forced out of hiding in the shed at gunpoint and handcuffed, was in custody for purposes of *Miranda* when he was asked about the coat.

But Bordeaux would have been in custody for *Miranda* purposes even if he had not yet been handcuffed while he was questioned. We cannot tell from the record whether Officer Shipley had holstered his gun before conducting the pat-down. Even assuming that he had holstered it, however, at most only a very short time would have elapsed since Bordeaux had been held at gunpoint.

Shipley forcefully barked his commands to Bordeaux. Another officer, Kelly Davis, said that she could hear Shipley's voice from her position in front of the trailer, and she agreed that Shipley "was commanding the subject to do certain things." One of those commands was that Bordeaux put his hands on top of the shed—and, under this assumed set of facts, he was then patted down while he was still in that position. Officer Shipley testified that Bordeaux was effectively restrained from the time he came out of the shed and Shipley would have had his hands on Bordeaux for the purpose of patting him down.

Under the Fifth Amendment *Miranda* tests we have cited from *Yarborough* and *Jones*, no reasonable person would have felt free to leave at that point. Even Officer Jones conceded that Bordeaux was not free to leave during the pat-down. This strongly suggests that Bordeaux was in custody, though *Berkemer* and other cases caution that this is not conclusive. Although not the sole means of analysis, Kansas courts also have considered an additional set of eight nonexclusive factors to determine whether an interrogation is a custodial one. Those factors are: (1) the time and place of the interrogation, (2) the length of the interrogation, (3) the number of officers present, (4) the statements made by the officers and by the defendant, (5) the presence of actual physical restraint on the defendant or something equivalent to that, such as drawn weapons or a guard stationed at an exit door, (6) whether the defendant is being questioned as a suspect or as a witness, (7) whether the defendant arrived voluntarily at the site of interrogation, and (8) whether the defendant left freely, was detained, or was arrested following the interrogation. *Jones*, 283 Kan. at 195.

Those factors relate to the separate existence both of custody and interrogation, but several appear relevant here on the custody issue. And consideration of them suggests that this was a custodial event, whether or not Bordeaux was already in handcuffs.

There were multiple police officers, and they were forceful—using a drawn weapon, strong vocal commands, and an immobilizing position (*i.e.*, hands on top of the shed, presumably with legs spread apart) to control Bordeaux. At the time of questioning, under the State's assumed facts, Shipley had his hands physically on

Bordeaux in the process of patting him down; indeed, Shipley agreed that Bordeaux was effectively restrained from the moment that he came out of the shed. Bordeaux did not come out of the shed voluntarily; he was viewed as a suspect, not a disinterested witness. And, of course, under the State's factual assumptions, Bordeaux was handcuffed almost immediately after he answered the question about the coat.

Because of the fact-intensive nature of cases like this, nearly identical cases are hard to find. We have looked for cases addressing whether a police officer's questioning of a suspect during a pat-down constitutes custodial interrogation. Some courts have held that it does, but others have disagreed. Compare *Argueta v. State*, 136 Md. App. 273, 764 A.2d 863, *cert. denied* 364 Md. 142, 771 A.2d 1071 (2001) (holding that a defendant was in custody for *Miranda* purposes when asked about a knife found in his pocket during the pat-down); *State v. Gerald B.*, 139 N.M. 113, 129 P.3d 149 (Ct. App. 2006) (holding that a defendant was in custody for *Miranda* purposes when asked during a pat-down whether he had any more marijuana); and *Commonwealth v. Ingram*, 814 A.2d 264 (Pa. Super. 2002) (holding that a defendant was in custody for *Miranda* purposes when asked to identify an object in his pocket that was not an apparent weapon), *appeal denied* 573 Pa. 671, 821 A.2d 586 (2003), with *State v. Healy*, 2000 WL 1062197 (Ohio App. 2000) (holding that the defendant was not in custody for *Miranda* purposes when one officer asked if the defendant had bought crack cocaine in a house); and *Commonwealth v. Pakacki*, 587 Pa. 511, 901 A.2d 983 (2006) (three-member majority concluded that a pat-down did not place a defendant in custody for *Miranda* purposes regarding questions about an object in a pocket; two justices concurred, holding that *Miranda* applied but that plain-feel exception made evidence admissible). None of these cases has facts close to those found in Bordeaux's, and we do not find them determinative of the result here.

The State cites a number of cases in support of its position, generally suggesting that the officers' actions were reasonable under *Terry v. Ohio*, 392 U.S.1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *Terry* does not set out standards under the Fifth Amend-

ment. Rather, it governs when an officer may reasonably detain someone without violating Fourth Amendment rights. "[T]he Fourth Amendment inquiry is not the same as, nor does it ultimately decide, the question of whether there was custody under the Fifth Amendment." *In re I.J.*, 906 A.2d 249, 257 (D.C. App. 2006). Accord *U. S. v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995); *U. S. v. Smith*, 3 F.3d 1088, 1097 (7th Cir. 1993); *U. S. v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993); *U. S. v. Acosta*, 363 F.3d 1141, 1148-50 (11th Cir. 2004). The Kansas Supreme Court has recognized the distinction between the Fifth Amendment analysis needed to determine questions under *Miranda* and the Fourth Amendment analysis needed to determine the lawfulness of an investigatory detention. *State v. Hill*, 281 Kan. 136, 142, 130 P.3d 1 (2006) (distinguishing cases that apply Fifth Amendment analysis when deciding a Fourth Amendment detention issue). We therefore find the cases cited by the State unpersuasive as arguments against the *Miranda* analysis that we have outlined here. We conclude that whether Bordeaux was in handcuffs or not, he was in custody at the time that he was asked about the coat.

*Bordeaux Was Interrogated for* Miranda *Purposes When He Was Asked a Question Admittedly Designed to Tie Him to a Potential Crime.*

An interrogation requires *Miranda* warnings only if it consists of "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). Accord *State v. Hebert*, 277 Kan. 61, 82 P.3d 470 (2004). The State's brief argues—correctly—that officers knew full well that there was a good chance Bordeaux was up to no good when they found him hiding in the shed. As the State put it, "[U]pon locating Mr. Bordeaux hiding inside of a dark storage shed, the officers had sufficient information to form a reasonable suspicion that a crime had been committed, was being committed[,] or may be committed by Mr. Bordeaux."

The State made that statement in support of its argument that the police had sufficient grounds to detain Bordeaux under *Terry*

standards, but the statement's import cannot be overlooked when determining whether an interrogation took place here. The owner of a trailer had called police to report a suspicious person lurking along the fence at the edge of the caller's property, near a storage shed in which he had stored personal property. Officers found no one suspicious the first time they came in response to that call. The trailer owner called back, however, to report that the person had been sighted a second time. Perhaps after seeing police cars in the area when they first responded, Bordeaux had hidden in an unlighted storage shed. On finding him there, officers had reasonable suspicion that he was hiding from them and that he may have committed a crime (such as burglary or trespass). See *State v. Bastian*, 37 Kan. App. 2d 156, 161, 150 P.3d 912 (2007) (reasonable suspicion existed to detain person found parked at night under the deck of a home based upon belief that he was a trespasser or was about to commit a crime). Hiding may be considered, along with other circumstances, in determining probable cause to arrest or to detain someone. *State v. Sanchez*, 137 N.M. 759, 763, 114 P.3d 1075 (N.M. App. 2005) (probable cause for arrest existed when a defendant was found hiding in a shed near the crime scene).

The State also notes in its brief that the question about the coat was designed to tie the person found in the shed to the suspicious person reported by the caller. The district court found as a matter of fact that "the officers were focusing upon [Bordeaux] as being the person who might have committed a crime." The caller had told police of a suspicious man wearing jeans and a black coat. Officer Jones found a black coat, and he asked Bordeaux whether that was his coat because that would tie Bordeaux to the person who had been seen lurking outside the fence. A question specifically designed to tie someone to a suspicious person is certainly so designed to gain incriminating information, especially when the individual being questioned has just been found hiding in a small, dark storage shed where he had no apparent right to be.

Our decision does not mean that officers are precluded from asking about weapons or other potentially harmful things that may be on a person during a pat-down. Those sorts of questions are considered part of the physical search itself, not interrogation. See

*State v. Gerald B.*, 139 N.M. at 118. But officers do not need to conduct an interrogation as to other potentially incriminating information during the pat-down. In Bordeaux's case, the question asked of him had nothing to do with potential dangers the officer might encounter during the pat-down.

The cases cited by the State on this issue are not on point. Those cases involved statements volunteered or statements that were made as officers took an inventory of property in apparent possession of someone already subject to arrest. See *U. S. v. La Monica*, 472 F.2d 580, 581 (9th Cir. 1972); *State v. Walls*, No. 89,231, Kan. App. unpublished opinion (September 26, 2003). Here, the question was asked specifically to tie Bordeaux to the suspect police had been sent to look for. Under *Innis*, this constituted interrogation.

## Conclusion

Based on the factual findings of the district court, we find that Bordeaux was subjected to custodial interrogation when he was asked about the coat. *Miranda* warnings were thus required, but none were given. The district court properly sustained the defendant's motion to suppress his response to the single question he was asked about the coat.

We note briefly that the State has also asked us to affirm the district court's separate ruling denying the defendant's motion to suppress as to other issues. No issue other than the district court's granting of the motion to suppress is properly before us on this interlocutory appeal. K.S.A. 22-3603. We therefore may not address the other issues briefed by the State.

The judgment of the district court is affirmed.

MALONE, J., dissenting: I respectfully dissent from the majority's conclusion that Officer Scott Jones' single question to Anthony Demonde Bordeaux about the ownership of the coat amounted to a custodial interrogation. As to the district court's determination of the facts, the district court's factual finding that Bordeaux was already handcuffed when he was asked about the coat is not supported by substantial competent evidence. Jones was the only wit-

ness who testified about the coat, and his testimony established that he asked Bordeaux about the coat before Bordeaux was handcuffed, while Officer Robert Shipley was still conducting the patdown. On direct examination, when asked, "Did you determine whose coat was in the shed?" Jones replied, "Yes, I asked the individual while Officer Shipley was patting him down if this coat was his, and he indicated, Yes, it was." Later, during cross-examination, Bordeaux's counsel asked, "And you picked up the coat and asked him if it was his?" Jones replied, "Yes, while he was being patted down." Jones was also asked, "[Bordeaux] was handcuffed immediately after he was patted down, correct?" to which Jones responded, "Yes."

The majority does not cite any direct testimony that Bordeaux was already handcuffed when questioned about the coat because there isn't any. The majority's conclusion that Bordeaux may have been handcuffed when questioned about the coat is based upon inferences from Shipley's testimony the district court may have considered but failed to articulate in making its findings. However, the only direct evidence on this point established that Bordeaux was not handcuffed at the time he was asked about the coat.

Based on this evidence, I conclude that Bordeaux was not in custody for *Miranda* purposes when Jones asked Bordeaux about the coat. There is no question that Bordeaux was *seized* when the police officers confronted him in the shed. However, this is not the same as being in *custody* for purposes of triggering the *Miranda* warnings. Courts have recognized a distinction between a custodial interrogation and an investigatory interrogation. *State v. Jacques*, 270 Kan. 173, 185, 14 P.3d 409 (2000). *Miranda* safeguards are only required for custodial interrogations, but not for investigatory, noncustodial interrogations. 270 Kan. at 186. The majority opinion blurs this distinction.

*Yarborough v. Alvarado*, 541 U.S. 652, 158 L. Ed. 2d 938, 124 S. Ct. 2140 (2004), and *State v. Jones*, 283 Kan. 186, 151 P.3d 22 (2007), are distinguishable from Bordeaux's situation because these cases involve controlled interviews of a suspect that occurred at the police station or at some location away from the crime scene. These cases did not involve on-the-scene questioning by police

officers investigating a crime prior to making an arrest. The eight factors discussed in *Jones* to determine whether an interrogation is custodial cannot be readily applied to on-the-scene police questioning as we have in Bordeaux's case.

Furthermore, it is too simplistic to say that Bordeaux's interrogation was custodial because a reasonable person would not have felt free to terminate the interrogation and leave. Whether a reasonable person would have felt free to leave is the test to determine when a person has been seized or detained. *State v. Hill,* 281 Kan. 136, 142, 130 P.3d 1 (2006). This is not the test to determine when a person is in custody for *Miranda* purposes. A person who is seized or detained by the police is never free to leave or terminate the encounter. However, this fact does not make the encounter custodial for purposes of whether *Miranda* warnings are required before police can engage in on-the-scene questioning. Otherwise, *Miranda* warnings would need to be the first words spoken by a police officer during any *Terry* stop. See *Terry v. Ohio,* 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

Finally, I conclude that Jones' single question to Bordeaux about the ownership of the coat did not amount to an interrogation designed to elicit an incriminating response. See *Rhode Island v. Innis,* 446 U.S. 291, 298-302, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). When the police confronted Bordeaux, they had no probable cause that he had committed a crime. In fact, no crime had even been reported to the police. The question about the ownership of the coat did not even become significant until Jones later discovered drug paraphernalia inside the coat pocket. When Jones asked Bordeaux about the coat, Jones could not have reasonably known that he would later find drug paraphernalia inside the coat pocket, and this clearly was not the reason Jones asked Bordeaux if he owned the coat. Bordeaux was not being investigated for a drug crime, or any other particular crime for that matter, when Jones asked about the coat.

The majority reasons that the police officers knew there was a good chance Bordeaux "was up to no good" when they found him in the shed, and the question about the coat was designed to tie Bordeaux to the suspicious person report that the police had re-

ceived earlier that evening. There is no doubt this is correct. But the police always have reasonable suspicion of some type of criminal activity whenever they question a suspect during a *Terry* stop. This does not mean that every question posed by the police is designed to illicit an incriminating response. The majority's standard for what constitutes an interrogation designed to elicit an incriminating response would necessarily include any and all police questioning during every *Terry* stop.

Jones' question to Bordeaux about the ownership of the coat was a general on-the-scene question asked by an officer during the factfinding process. Jones was most likely just trying to understand what was going on and whether any other individuals were present at the scene. This was not a question that Jones should have reasonably known was likely to illicit an incriminating response. Thus, the question did not amount to an interrogation for *Miranda* purposes.