NOT DESIGNATED FOR PUBLICATION

No. 120,677

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PATRICIA E. SINCLAIR,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed May 8, 2020.
Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., SCHROEDER, J., and LAHEY, S.J.

PER CURIAM: Patricia E. Sinclair appeals her jury conviction for arson. She now argues there were several points of error that denied her the opportunity for a fair trial. She alleges the district court committed judicial comment error, the prosecutor committed prosecutorial error, and the statements she made to a fire investigator while she was in the hospital resulted in a custodial interrogation and should have been suppressed. Sinclair claims these errors are reversible both individually and cumulatively. Upon our review, we find no errors sufficient individually or cumulatively to warrant reversal. We affirm her conviction.

1

Sinclair was convicted by a jury of arson based on a fire at her house on October 11, 2016. At trial, the State presented evidence reflecting Sinclair knowingly set fire to her house on the day she was scheduled to be served with an eviction notice after the completion of foreclosure proceedings.

Sinclair owned her house, but she failed to make her mortgage payments to U.S. Bank (the Bank). Based on the delinquent loan, the Bank foreclosed on the property. On October 11, 2016, Lieutenant Clark Rials with the Douglas County Sheriff's Office tried to serve Sinclair with the eviction notice. Before he arrived, someone from the sheriff's office had called Sinclair to tell her someone would be by to serve the eviction notice.

When Rials arrived at the house, he noticed a car parked in the driveway. He banged on the front and back doors and announced his presence, but no one answered. As he returned to the front door, he heard a tapping sound and followed it to the east side of the house near the gas meter. Rials said it sounded as if someone was tapping on a metal gas line in the basement. He knocked on the front door a second time and then left.

That same day, Melissa Warren, a retired firefighter and Sinclair's neighbor two houses down, was outside observing a contractor crew pour concrete in her garage. She heard what sounded like a heavy metal tool banging on a pipe coming from Sinclair's house. She went to the house and determined the noise was coming from the basement. Warren yelled into the basement window and asked Sinclair whether she was all right, but no one responded. Hours later, Warren saw smoke coming from the back door of the house. One of the contractors called 911, and Warren started moving furniture, boxes, and other debris obstructing the front door to help the firefighters make entry. She tried to open the front and back doors, but both were locked.

The Lawrence Fire Department (the Department) responded to the fire. Lieutenant Jeff Holland testified the fire was still growing when the firefighters arrived. Holland and another firefighter forced open the front door. Due to the amount of debris in the house, even after the door was opened, they were able to open the door barely wide enough to squeeze through. The house was heavy with white smoke, so they used a thermal imaging device to locate Sinclair in the kitchen.

According to Holland, he made it to the kitchen by crawling on top of the clutter. When he announced his presence, Sinclair immediately asked him to get out of her house. He said Sinclair appeared angry and repeatedly resisted their attempts to remove her. Holland and another firefighter carried Sinclair out of the house through the back door.

Sinclair was taken to an ambulance and treated for smoke inhalation. According to one medic, Sinclair appeared very angry and was cussing and saying things like, "They should have left me there to die," and "I can't believe the police were smoking me out." Sinclair mentioned to the medic she had taken pills and admitted she had tried to commit suicide. Another medic similarly testified Sinclair had mentioned she wanted to die. Sinclair was air-lifted to a hospital in Kansas City for treatment.

Jason Love, a lieutenant and fire investigator with the Department, investigated the house to determine the fire's origin and cause. He took photographs of the house to document his investigation, which the State admitted into evidence. Love ruled out an extension cord, the chimney, the electrical panel, and the furnace as the origin. By tracing the smoke, burn, and char patterns throughout the house, he concluded someone had intentionally started the fire a few feet inside the basement door. He found a used match surrounded by burnt debris at the origin of the fire. In the kitchen adjacent to the basement, Love found a box of matches and a metal-headed hammer next to a green wooden chair. He testified the matches in the kitchen, like the match recovered from the basement, had wooden stalks with square-shaped ends.

About two weeks after the fire, as part of Love's investigation, he interviewed Sinclair at the hospital. Love made an audio recording of the interview, which the State admitted into evidence. According to Love, when he asked Sinclair during the interview whether she had started the fire, Sinclair responded, "[A]nything's possible."

The defense's overall theory was the State provided only speculative evidence Sinclair had the required motive to burn the house. Sinclair testified she was 71 years old at the time of the trial. She said the foreclosure process on her house was incredibly long and very painful. She admitted she was aware at the time of the fire the house was owned by the Bank. Sinclair testified her health limited her mobility before the fire and it was hard for her to get up and down the stairs to the basement.

Sinclair could recall very little about the day of the fire. She denied knowing the sheriff's department was going to serve her with eviction papers. All she remembered about the fire was being in a state of unconsciousness or nothingness and sitting on her kitchen chair when she saw smoke going out the small opening in her kitchen window. When the firefighters came to rescue her, she was worried they would hurt her shoulders as they carried her. Sinclair explained she used the matches found next to the chair she was sitting on during the fire to relight the pilot light on her gas stove and furnace. She denied having suicidal thoughts that day.

Sinclair remembered Love visiting her at the hospital in October 2016. She testified they got along fine but he asked her some really ridiculous questions. She said, "[T]here was a point in time where I thought he'd gone too far in terms of saying I'd said things and trying to get me to say things that weren't true." She denied lighting a match in the basement to burn down the house.

4

The jury convicted Sinclair of arson, and she was sentenced to 18 months in prison, suspended to 24 months' supervised probation. Sinclair timely appealed. Additional facts are set forth as necessary herein.

ANALYSIS

*No reversible judicial comment error*

Sinclair argues the district judge engaged in reversible judicial comment error by misstating the legal reasoning for an admonishment to the jury and by relying on the State to clarify the district court's explanation of the admonishment to the jury.

Kansas courts have generally "used the term 'judicial misconduct' to loosely describe any judicial error that implicates the right to a fair trial and does not concern a jury instruction or legal ruling." *State v. Boothby*, 310 Kan. 619, 626, 448 P.3d 416 (2019). But in *Boothby*, 310 Kan. at 626, our Supreme Court carved out "judicial comment error" from the "'judicial misconduct' umbrella," defining "judicial comment error" as "erroneous judicial comments made in front of a jury (that are not jury instructions or legal rulings)." The court found "*Sherman*'s 'error and prejudice'" test for prosecutorial error "applies with equal force to judicial comment error," both of which can affect a defendant's constitutional right to a fair trial. *Boothby*, 310 Kan. at 627; see *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Now, in line with *Sherman*, whether judicial comment error occurred "must be conducted on a case-by-case basis, always informed by existing caselaw concerning when judicial comments fall outside a permissible latitude." *Boothby*, 310 Kan. at 627. Assuming an error occurred, under the prejudice prong, "the party benefitting from the error . . . [must prove] beyond a reasonable doubt that the error did not affect the outcome of trial in light of the entire record." 310 Kan. at 627. This review differs from the

5

traditional judicial misconduct test "which puts the burden on the party alleging error to show prejudice." 310 Kan. at 625.

Both parties agree the challenged comments should be analyzed under *Boothby*'s judicial-comment-error analysis. We agree. Judicial comment error is reviewed under the same standard as judicial misconduct. Appellate courts "'exercise unlimited review over judicial misconduct claims, and review them in light of the particular facts and circumstances surrounding the allegation.'" 310 Kan. at 624.

Sinclair admits she did not contemporaneously object to the district judge's comments at trial. But her failure to do so does not bar our review. "When a defendant's right to a fair trial is alleged to have been violated, the judicial comments are reviewable on appeal despite the lack of a contemporaneous objection." *State v. Brown*, 280 Kan. 65, 70, 118 P.3d 1273 (2005).

Before closing arguments, the parties met with the district judge in chambers to discuss jury instructions. During that discussion, the prosecutor said she anticipated defense counsel would bring up in his closing the State had failed to test the match recovered from the basement for DNA evidence. She told the judge that under Kansas caselaw, if defense counsel made the argument, she could respond in rebuttal that Sinclair could have had the match tested for DNA evidence. According to the prosecutor, such an argument would not effectively shift the burden of proof from the State to Sinclair.

During the closing argument defense counsel argued:

"[DEFENSE COUNSEL]: Let's talk about, for example, the investigation. This investigation was incomplete. And the reason it was incomplete is because [the State] had that match that they had recovered from the house, and they were aware of the fact that the KBI lab can test those kinds of articles, particularly a match, forensically.

6

"They have DNA capabilities which they could have recovered some materials that might have matched whoever set the fire. They could have had handprints, perhaps, or thumbprints or any kind of forensic test that was possible by the KBI. But they didn't even send it in.

. . . .

"Now, the State's going to tell you, well, why didn't the defendant run those tests? The defendant didn't run the test because it's not our burden of proof. It's the State's burden of proof."

At that point, the prosecutor requested a sidebar with the district judge. The prosecutor explained her objection to defense counsel's burden-shifting argument and requested an admonition to the jury. The district judge admonished the jury to disregard defense counsel's last comments, stating:

"THE COURT: Had a little discussion about the law. And I'm going to ask you to disregard the last comments made by [defense counsel] concerning the testing not being done by the defendant and that they don't have to because the State has the burden.

"It is an accurate statement that the defense could have had that tested. But the fact that they did not does not shift that burden, then, to—I'm not saying this very artfully —to the State.

"Would that be accurate? I admit I'm not saying that very well. And [prosecutor], I think you said it better than I did when you were at the bench.

"[PROSECUTOR]: Judge, that by the defense alleging that the State's going to come back up and say that they could have tested those objects and didn't, it's not burden-shifting by the State.

"THE COURT: It is not—that's correct. It is not burden-shifting by the State for the State to say the defendant could have had these things tested."

7

Before us, Sinclair does not object to the admonition itself but, rather, the district judge's *explanation* of her admonition to the jury. She argues the district judge's explanation "left the jury profoundly confused about who had the burden of proof in [the] case" and the jury likely "started deliberations with the belief that Ms. Sinclair had some obligation to prove her innocence." Sinclair also argues, during the same exchange, the district judge's request for the State to clarify her inarticulate explanation to the jury "conveyed the impression that the State's interpretation of the law was controlling on the court."

As for Sinclair's first argument, the State has the burden to prove beyond a reasonable doubt every required element of the defendant's charged crime. See K.S.A. 2019 Supp. 21-5108(a); *Miller v. State*, 298 Kan. 921, 930, 318 P.3d 155 (2014). It is "'improper for the [State] to attempt to shift the burden of proof to the defendant.'" *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016). But generally, the prosecutor does not shift the burden of proof to the defendant by pointing out the defendant's failure to present certain evidence. See *State v. Duong*, 292 Kan. 824, 832-33, 257 P.3d 309 (2011). The parties' sidebar with the district judge shows this was the legal distinction behind the district judge's admonition to the jury: the prosecutor could point out Sinclair could have tested the match for forensic evidence herself without shifting the burden of proof to Sinclair.

The prosecutor's objection to defense counsel's actual argument caused the district judge's explanation of the admonition to misinform the jury about the State's burden of proof. The district court's instruction for the jury to "disregard *the last comments* made by [defense counsel]" effectively told the jury to disregard defense counsel's last statement entirely, including his correct remark about the burden of proof. (Emphasis added.) And the district judge then told the jury *defense counsel's* failure to get the match tested did not shift the burden *to the State.* A more accurate statement would have been "defense counsel's failure to get the match tested did not shift the burden *to Sinclair*."

8

Under the prosecutorial error analysis, a prosecutor's clear misstatement of the law is error. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). As Sinclair points out, now that *Boothby* has aligned judicial comment error with the prosecutorial error analysis, the district judge's misstatements about the State's burden of proof were error as misstatements of the law.

Regarding the last instance of alleged error, the district judge's remark—the prosecutor "said it better than I did"—indicated to the jury the State's explanation of the law was "better" or more accurate than her own. At the district judge's request, the prosecutor provided her own explanation of the admonition, which the district judge acknowledged was correct. A district judge "should endeavor to conduct the trial in an atmosphere of impartiality and, therefore, should refrain from remarks or conduct that may injure a party." *State v. Miller*, 308 Kan. 1119, 1154, 427 P.3d 907 (2018); see also Canon 2, Rule 2.3, Comment [1] (2020 Kan. S. Ct. R. 449) (A judge must not show "bias or prejudice in a proceeding."). For a moment in the trial, the district judge showed at least some partiality to the State. The better practice would have been for the district judge to take a short recess or discuss the explanation with the prosecutor and defense counsel at the bench and outside the jury's hearing. The district judge's remark was improper.

But even assuming this isolated transfer of authority to explain a point of law to the jury was error, the error is not reversible, either on its own or when combined with the district judge's misstatements about the State's burden of proof. The State has proved beyond a reasonable doubt the district judge's comments "did not affect the outcome of trial in light of the entire record." See *Boothby*, 310 Kan. at 628-29.

The State argues the district judge's improper comments were brief. The district judge's mischaracterization of the State's burden of proof only occurred twice in the trial. And aside from the district judge's momentary partiality to the State during the same

exchange, the trial record shows this was not a reoccurring issue. See *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002) ("Mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict.").

The State also relies on the mitigating effect of the correct burden-of-proof jury instruction given by the district judge. In support, the State cites *State v. Carmichael*, 240 Kan. 149, 727 P.2d 918 (1986). There, the district judge repeatedly thwarted defense counsel's arguments about the burden of proof, and at one point the district judge commented:  "'State has the burden, but that doesn't mean the Defendant doesn't have the burden of meeting the evidence. Overruled.'" 240 Kan. at 157. Later in the trial, the district judge correctly instructed the jury on the burden of proof. On appeal, Carmichael argued the district judge engaged in misconduct by suggesting to the jury the burden to prove his guilt did not rest with the State. Our Supreme Court found the district judge's comments were not prejudicial enough to demand reversal because any confusion caused by the comments was cured by the district judge's legally correct instruction. 240 Kan. at 158. Although decided under the pre-*Boothby* judicial misconduct analysis, the State maintains *Carmichael*'s reasoning should apply here.

In response, Sinclair claims *Miller*, 308 Kan. 1119, and *State v. McBride*, 307 Kan. 60, 405 P.3d 1196 (2017), support her position that *Carmichael*'s reasoning is inconsistent with more recent Kansas cases. But we find no support for Sinclair in those cases. The *Miller* court addressed whether the district court erred in denying the defendant's for-cause challenges to prospective jurors who allegedly had preconceived opinions about his guilt. 308 Kan. at 1137-44. And in *McBride,* our Supreme Court found the jury would not have understood the judge's instruction on the defendant's presumption of innocence to exclude "the evidentiary presumption for which the prosecutor advocated, i.e. 'doesn't [the victim] deserve a certain presumption as well?'" 307 Kan. at 72.

*Carmichael* is a better match to these facts. And *Boothby* recognized jury instructions may mitigate the prejudicial effect of improper judicial comments. Like the jury in *Boothby*, the jury here was also instructed to decide the case only on the evidence admitted. See 310 Kan. at 629.

Finally, the State argues, given the "incredibly strong" evidence presented at trial, the district judge's errors did not affect the jury's verdict. See *Sherman*, 305 Kan. at 111 ("[T]he strength of the evidence against the defendant may secondarily impact [the prosecutorial-error] analysis."). The jury was instructed to find the following facts beyond a reasonable doubt to convict Sinclair of arson:

"1.     [Sinclair] knowingly, by means of fire, damaged a building in which U.S. Bank had an interest, without the consent of U.S. Bank.

"2.     The property was a dwelling.

"3.     This act occurred on or about the 11th day of October, 2016, in Douglas County, Kansas."

Love provided extensive testimony about the source of the fire. After methodically eliminating potential fire sources—an extension cord, the chimney, electrical panel, and furnace—he traced the smoke, burn, and char patterns throughout the house and concluded the fire had been set intentionally a few feet within the door to basement. Love found a used match at the fire's origin, as well as a box of matches and a metal-headed hammer next to the chair Sinclair testified she was sitting on during the fire. The State admitted into evidence pictures taken after the fire in support of Love's testimony. These photos as well as Love's testimony provided a clear picture the house was filled with clutter. Earlier that day, two witnesses heard banging sounds coming from around the gas meter as the pipe entered the basement.

11

The evidence reflects sometime before the fire, Sinclair received a phone call about her impending eviction. Although Sinclair denied receiving the call, she admitted she was aware she no longer owned the house. When inside the ambulance, Sinclair repeatedly voiced her wish to die and accused the police of "smoking her out." She admitted to one medic she had tried to commit suicide. Love said when he asked Sinclair during his interview whether she had started the fire, Sinclair responded, "[A]nything's possible." This evidence supports the State's argument Sinclair had the necessary motive to burn down her house.

Given the legally correct jury instruction on the burden of proof, the jury instruction to decide the case only on the evidence, the isolated occurrence of the judicial comments, and the strength of the evidence presented at trial, we find the State has met its burden to prove the judicial comment errors were harmless and, in light of the record as a whole, did not affect the outcome of the trial.

*No reversible prosecutorial error*

Sinclair next argues the prosecutor erred during defense counsel's closing arguments when she objected to defense counsel's statement about the State's burden of proof. She also claims the prosecutor erred by arguing a fact not in evidence during her closing.

When evaluating a claim of prosecutorial error, we follow a two-step process: First, we determine whether an error occurred; and second, if an error has been found, we evaluate the prejudice it caused to determine whether it was harmless. Under the first step, error occurs if we find the prosecutor's statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. at 109.

It is improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof. But prosecutors have "'considerable latitude to address the weaknesses of the defense.'" *Pribble*, 304 Kan. at 837; see *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 (2001) (where jury properly instructed on State's burden of proof, "prosecutor may argue inferences based on the balance or lack of evidence"), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007).

During the same exchange in which Sinclair alleges the district judge's comments were error, the prosecutor lodged an objection outside of the jury's hearing:

"[Defense Counsel]: Now, the State's going to tell you, well, why didn't the defendant run those tests? The defendant didn't run the test because it's not our burden of proof. It's the State's burden of proof.

"[Prosecutor]: Your Honor, may we approach?

"The Court: Yes.

*"(Whereupon, the following proceedings were had outside the hearing of the jury:)*

"[Prosecutor]: My objection is for [defense counsel] to make that statement, 'It's not our burden of proof. It's the State's burden of proof.' That is exactly the argument that I was trying to prevent when we had our conversation back in chambers and I cited the cases. It's improper argument. It should—they should not be allowed to consider that." (Emphasis added.)

Sinclair now argues the substance of the prosecutor's objection misstated the State's burden of proof. Although it is well established a prosecutor's misstatement of the law is error, prosecutorial error concerns the prejudicial effect a prosecutor's statements

13

may have on *the jury*. See *Ross*, 310 Kan. at 221. Here, the substance of the prosecutor's objection occurred during a sidebar discussion outside the jury's hearing. All the jury heard was, "Your Honor, may we approach?" Sinclair improperly frames the prosecutor's objection as a prosecutorial-error issue. It was not. The jury never heard the discussion at the bench. We will proceed no further on this point.

Next, Sinclair argues the prosecutor filled in unknown facts with an unreasonable inference during her closing argument when she claimed Rials "actually spoke with Ms. Sinclair about her pending eviction shortly before the fire."

As a fundamental rule, a prosecutor must confine his or her remarks to matters in evidence. But prosecutors may craft arguments on reasonable inferences to be drawn from the evidence. *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017).

The prosecutor remarked during her closing argument:

"Corporal Rials told you that he called [Sinclair] before he went over there and actually talked to her on the phone and said, 'I'm coming to serve you eviction papers.' Those documents are there. You can look at them.

"So Ms. Sinclair knew before Corporal Rials ever arrived at the house why he was coming."

To a degree, Sinclair is right. Rials did not directly testify he was the person who called Sinclair about the impending eviction. Using passive voice, Rials said, "Prior to me taking the papers over there, *she was given a phone call* that we were going to serve her." (Emphasis added.) Rials could have been referring to himself or someone else as the person who called Sinclair. The prosecutor filled in the unanswered fact by inferring Rials was the one who called Sinclair.

14

But even if the prosecutor's inference were unreasonable, the error would be harmless. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109.

The State argues the crucial component of Rials' testimony was not the identity of the caller, but, rather, someone called Sinclair to tell her eviction papers were going to be served on her. The State's argument is convincing. Even though the prosecutor's statement overstated Rials' testimony, it tracked with the evidence reflecting Sinclair was aware of her impending eviction. The prosecutor pointed out right after the challenged statement, "So Ms. Sinclair *knew* before Corporal Rials ever arrived at the house why he was coming." (Emphasis added.) The prosecutor argued Sinclair's knowledge of the eviction was evidence of her motive to burn the house. Context shows the primary inference the prosecutor wanted the jury to draw was not the identity of the caller but Sinclair's motive for arson. See *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017) (court must consider prosecutor's comments in the context in which they were made, rather than in isolation).

And the potential prejudicial effect of the prosecutor's statement is lessened by the district court's jury instruction to decide the case only on the evidence admitted. This court presumes jurors follow the instructions they were given. *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017).

The strength of the evidence against the defendant is relevant to the prosecutorial-error analysis. See *Sherman*, 305 Kan. at 111. Here, there was substantial circumstantial evidence to support the conclusion Sinclair knowingly set fire to the house. As the State points out, "[T]he only person with the means, motive, and opportunity to set the fire was Sinclair."

Based on the context in which the prosecutor's statements were made, the district court's instruction to the jury to disregard any statement by counsel unsupported by the evidence, and the strength of the evidence, we find the State met its burden to establish there is no reasonable possibility the statements contributed to the verdict.

*No custodial interrogation*

Sinclair continues her claim on appeal by arguing her interview by Love at the hospital was an interrogation while in custody and must be suppressed. In support of her argument, she notes Love failed to read her the warnings required before questioning her under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

We use a two-part inquiry to review the district court's determination on whether the questioning was custodial. First, we apply a substantial competent evidence standard to review the district court's factual findings on the circumstances of the interrogation. In doing this review, we do not reweigh the evidence, resolve conflicting evidence, or redetermine witness credibility. Second, we apply a de novo standard of review to determine whether, under the totality of the circumstances, a reasonable person would have felt free to end the questioning and leave. *State v. Guein*, 309 Kan. 1245, 1251-52, 1254, 444 P.3d 340 (2019). It is the State's burden to prove the challenged statements are admissible. K.S.A. 22-3215(4).

Before trial, Sinclair moved to suppress her conversations with several firefighters, including Love's recorded interview of her while still a patient in the hospital. At the hearing on Sinclair's motion, Love testified he did not give Sinclair *Miranda* warnings before asking her whether she had started the fire. Love said Sinclair was the only suspect in the case when he interviewed her. The district court reviewed the audio recording of the interview before ruling on the motion. The district court made the following factual findings about the interview:

16

- The interview occurred at the hospital;

- Love's demeanor was "very kind and very patient" and Sinclair's demeanor was "coherent and very conversational";

- The interview lasted about two hours, but for most of the interview, "Sinclair was simply talking without questions being asked," and Love "patiently listened to everything she had to say without . . . directing her";

- Love asked Sinclair directly whether she had started the fire, but they also discussed other ways the fire might have started;

- They "talked at length about other people in [Sinclair's] neighborhood, their personal habits, [and] their private lives";

- Sinclair never asked Love to leave, and when Love tried to finish the interview, Sinclair kept the conversation going; and

- Sinclair was not arrested after the interview.

Based on these factual findings, the district court found "[w]ith the exception of the fact of whether she was being questioned as a suspect, I believe every other [factor definitely weighs in favor that it was an investigative interview." Accordingly, the district court denied Sinclair's suppression motion.

The parties do not dispute Love questioned Sinclair, nor do they dispute the underlying facts. Consequently, the only question before us is whether, under the totality of the circumstances, Sinclair was in custody at the time of the Love's questioning. See *Guein*, 309 Kan. at 1254.

"*Miranda* warnings are necessary to satisfy the requirements of the Fifth Amendment to the United States Constitution, which provides a right to remain silent about possible criminal wrongdoing and thus avoids coerced statements and confessions." *State v. Bordeaux*, 38 Kan. App. 2d 757, 759, 172 P.3d 78 (2007). Section 10 of the

17

Kansas Constitution Bill of Rights provides the same protection. See *State v. Aguirre*, 301 Kan. 950, 954, 349 P.3d 1245 (2015).

But the *Miranda* safeguards are triggered only when the accused is subject to custodial questioning, which occurs when law enforcement has taken a person into custody or the person is otherwise deprived of his or her freedom in any significant way at the start of the interview. *Miranda*, 384 U.S. at 444. "A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation has reached the accusatory stage." *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012).

"An officer's words or actions, including explicit questioning, is interrogation only if the officer should have known that the questioning was 'reasonably likely to elicit an incriminating response from the suspect.'" *State v. Palacio*, 309 Kan. 1075, 1085, 442 P.3d 466 (2019). And Kansas courts have considered a list of nonexclusive factors to determine whether an interrogation is custodial or merely investigatory. Those factors include:

> "(1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No single factor outweighs another, nor do the factors bear equal weight. Every situation must be analyzed on its own particular facts. " *Guein*, 309 Kan. at 1254.

We now analyze each of the factors as they apply under these facts.

18

1.      *Time and place.* When Love conducted the interview, Sinclair was the only suspect in the case. The interview occurred in Sinclair's hospital room. Generally, a hospital is a neutral location, and a person questioned in a neutral location does not normally face the same coercive pressures as someone "questioned in a police-dominated atmosphere." *Warrior*, 294 Kan. at 497.

2.      *Duration of investigation.* The interview lasted about two hours. Generally, the shorter the interview, the less likely it is to be custodial. See, e.g., *State v. Bridges*, 297 Kan. 989, 1009, 306 P.3d 244 (2013) (finding 30-minute interview was "short" and weighed in favor of interview not being custodial). But as the State points out, Love repeatedly tried to end the interview around the 90-minute mark. Sinclair continued to reengage Love in conversation, which extended their interaction by about 30 minutes. And most of their conversation dealt with topics unrelated to the fire. See *Warrior*, 294 Kan. at 498 (declining to find custody when suspect had control over interview's length).

3.       *Number of law enforcement officers present.* Love was the only officer present in the room.

4.      *Conduct of officers and person interrogated.* Sinclair volunteered most of the information she gave without being prompted with questions. Love listened to Sinclair patiently while she switched from topic to topic, which included her family relationships, her physical health, and her neighbors' personal lives. Love's actual questions of Sinclair about the cause of the fire were conversational and not accusatory. As for Sinclair's conduct, she communicated coherently throughout the interview.

5.      *Physical restraint.* There is no evidence Love physically restrained Sinclair. Even so, Sinclair argues she was, in a sense, medically restrained because she could not leave the room without risking her physical well-being. At the time of the interview, Sinclair was being treated for burns and smoke inhalation. But even if Sinclair's injuries

19

prevented her from leaving the room, Love did not instigate Sinclair's confinement. See *Warrior*, 294 Kan. at 498 ("[P]hysical incapacity resulting from forces outside the control of law enforcement does not amount to custody.").

6.      *Whether the person was questioned as a suspect or as a witness.* Sinclair argues Love questioned her as a suspect. Love acknowledged Sinclair was the only suspect he had when he interviewed her. Love directly asked Sinclair several times whether she had started the fire. About halfway into the interview he asked, "Is it possible that you could've started the fire in the house?" Sinclair responded, "[A]nything's possible." He asked her the same question about 30 seconds later, and Sinclair responded, "I don't think so." At one point, Sinclair asked Love whether she was going to be arrested. Love replied, "Not today, you're not getting arrested by anybody . . . not by me."

7.      *How the person arrived at the interrogation.* Sinclair was taken to the hospital for medical treatment, not by order of law enforcement and had been in the hospital for several days.

8.      *Aftermath of the interrogation.* Love did not arrest Sinclair after the interview. As he was leaving, Love said, "Take care and thank you." He left Sinclair with his card and told her to contact him if she had any information. As the State points out, our courts generally look to whether the individual was allowed to leave, was detained further, or was arrested after the interrogation. See *Warrior*, 294 Kan. at 496, 503; *State v. Schultz*, 289 Kan 334, 341, 212 P.3d 150 (2009).

The only factor somewhat favoring Sinclair's argument is she was Love's only suspect at the time of the interview. "But the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings." *Warrior*,

20

294 Kan. at 503. Thus, looking at the totality of the circumstances, we find Sinclair's interview was not a custodial interrogation.

*No cumulative error*

Finally, Sinclair argues cumulative error requires reversal of her conviction and remand for a new trial. She argues even if the errors she alleged on appeal do not individually require reversal of her conviction, the cumulative impact of the alleged errors denied her a fair trial.

> "'When faced with a cumulative error claim, this court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial.' However, 'if any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.' [Citations omitted.]" *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017).

The only error we have clearly identified is the district judge's comment error when she misstated the State's burden of proof while explaining the admonition to the jury. We have also identified two potential errors: the district judge's deference to the State in explaining her admonition and the prosecutor's overstatement of Rials' testimony. Even if we presume each of these three instances were error, the errors are harmless beyond a reasonable doubt, both individually and collectively. None of these errors were significant on their own. Together, these errors are still inconsequential considering the strength of the evidence and the mitigating effect of the jury instructions. Sinclair received a fair trial, and we affirm her conviction for arson.

Affirmed.